STATE OF NORTH CAROLINA, on relation of James E. Long, Commissioner of Insurance, AS LIQUIDATOR OF THE INVESTMENT LIFE INSURANCE COMPANY OF AMERICA, Plaintiff v. ILA CORPORATION (Formerly First Republic Financial Corporation); and JAMES D. PETERSON, the only remaining Defendant

No. COA98-780

(Filed 6 April 1999)

**1. Insurance— liquidation of company—standing of liquidator**

Plaintiff-Insurance Commissioner had standing to bring suit in an action for breach of fiduciary duties and negligent mismanagement of a liquidated insurance company where he brought the action as liquidator of the company. N.C.G.S. § 58-30-1(b) and (c) confer standing upon plaintiff to assert ILA's claims against defendant, particularly for breach of fiduciary duty and negligent mismanagement.

**2. Statute of Limitations— claims by insurance company liquidator—two-year extension**

Claims for breach of fiduciary duties and negligent mismanagement arising from the liquidation of an insurance company were not barred by the applicable statute of limitations where the alleged acts of misconduct occurred within three years of the order appointing plaintiff as liquidator and where plaintiff filed these actions within two years of his appointment. N.C.G.S. § 58-30-130(b).

**3. Insurance— liquidation of company—mismanagement and breach of fiduciary duties—findings**

There was substantial evidence supporting challenged findings of fact in a nonjury trial on claims for breach of fiduciary duties and negligent mismanagement arising from the liquidation of an insurer. Although defendant correctly pointed out a modicum of errors, none are material.

**4. Corporations— business judgment rule—breach of fiduciary duties and negligent mismanagement**

The trial court's findings in a nonjury trial on claims for breach of fiduciary duties and negligent mismanagement arising from the liquidation of an insurance company supported the conclusion that defendant is not protected by the business judgment

rule. Defendant was a leading participant in a plan to benefit himself and his interests at the expense of the company and his actions were more than mere errors in judgment. The court's findings also support its conclusion that defendant's actions did not comply with the requirements of N.C.G.S. § 55-8-30(b).

### 5. Corporations— business judgment rule—advice of professionals

There was substantial evidence in a nonjury trial on claims for breach of fiduciary duties and negligent mismanagement arising from the liquidation of an insurance company to support the conclusion that defendant breached his fiduciary duties and that his actions were not made in reliance on the advice of professionals. Defendant sought advice on corporate decisions, but ignored advice that was contrary to his efforts.

### 6. Insurance— liquidation of insurance company—negligent mismanagement and breach of fiduciary duties—evidence of damages—sufficient

There was substantial evidence to support the finding of the trial court in a nonjury trial on claims for negligent mismanagement and breach of fiduciary duties arising during the liquidation of an insurance company that plaintiff-insurance commissioner met his burden of showing that defendant's actions proximately caused damage to the company.

Appeal by defendant James D. Peterson from order and judgment entered 3 April 1998 by Judge L. Bradford Tillery in Wake County Superior Court. Heard in the Court of Appeals 15 February 1999.

*Bode, Call & Stroupe, L.L.P., by V. Lane Wharton, Jr., for plaintiff-appellee.*

*Blanco Tackabery Combs & Matamoros, P.A., by Reginald F. Combs, for defendant-appellant James D. Peterson.*

EDMUNDS, Judge.

Defendant James D. Peterson was a shareholder and a member of the board of directors of Investment Life & Trust Company (ILT). Faced with the possibility of a hostile corporate takeover of ILT by an unacceptable company, the South Carolina Commissioner of Insurance requested that defendant put together an alternative offer. In response, defendant set up a consortium of investors who formed

First Republic Financial Corporation (FRFC), of which defendant was a director, the Chief Executive Officer, and a shareholder. FRFC gained control of ILT around 1986. In acquiring ILT, FRFC borrowed a portion of the purchase price from Trust Company Bank (Trustco). Trustco secured the loan with ILT stock and defendant's personal guarantee. FRFC later refinanced this loan with Trustco, borrowing $5 million to be repaid by 1995.

In 1989, to ensure the long-term survival of ILT, FRFC planned to expand into new markets in which it was then unlicensed. To do so, FRFC acquired Triad Life Insurance Company of North Carolina (Triad) because it was licensed in numerous states. As required by the terms of its refinancing loan, FRFC needed Trustco to approve the Triad purchase. Trustco approved the purchase, on the condition that FRFC accelerate repayment of its loan from Trustco to June 1990 rather than 1995. In addition, acquisition of Triad required approval by the North Carolina Insurance Department (the Department). Accordingly, FRFC filed a "Form A[,] Statement Regarding the Acquisition of Control of or Merger With a Domestic Insurer" (Form A) with the Department. In its initial Form A, FRFC stated that it would contribute $5 million in capital to ILT. FRFC later amended its Form A to indicate that FRFC would contribute only $1.7 million in assets instead. These assets consisted of limited partnership units, a venture organized by defendant and his brother. Based on the amended statement, the Department approved FRFC's application.

FRFC next merged ILT with Triad, forming Investment Life Insurance Company of America (ILA). We note that ILA is not to be confused with non-appealing defendant ILA Corporation, which is a successor entity to FRFC. For clarity, we will continue to refer to FRFC throughout this opinion. The merger of ILT with Triad to form ILA also required the Department's approval. Accordingly, in February 1990, FRFC submitted a second Form A to the Department. The second Form A indicated that FRFC planned to obtain $10-12 million in equity financing, $4 million of which FRFC would use to prepay its debt to Trustco (now due in June 1990). Statements by FRFC about its debts to ILT created concern sufficient to lead the Department to request more information. FRFC responded that it had borrowed $2.25 million from ILT to make payments to Trustco. The Department approved the merger on 30 April 1990, but notified FRFC that future loans from ILA to FRFC were unacceptable.

With FRFC's debt to Trustco coming due, FRFC needed capital. As a result, FRFC sought the Department's approval of a proposed service agreement between ILA and FRFC. Defendant advised the Department that the purpose of the agreement was to shift ILA's risk of greater-than-expected operating expenses to FRFC and to ensure that any such expenses would not ultimately become the liability of ILA. As part of the Form A seeking approval of the service agreement, defendant personally guaranteed a line of credit to fund operational losses for 1990; however, he never obtained the line of credit. Based upon defendant's representation, the Department approved the agreement. From June 1990 to September 1990, ILA paid $2.6 million of FRFC's expenses, and ILA carried FRFC's debt as an asset on ILA's books in order to maintain its required capital and surplus.

In June 1990, when FRFC's debt to Trustco came due, FRFC investors put up $600,000 to extend the loan's due date until January 1991. Towards the end of 1990, FRFC's attempt to obtain equity financing failed. Moreover, pursuant to the Department's approval of the Triad/ILT merger, FRFC had agreed to repay its $2.25 million pre-merger debt to ILT. Under the service agreement, FRFC owed ILA $2.6 million. Expenses associated with a proposed public offering had also been advanced by ILA to FRFC, as a result of which, FRFC further owed ILA $600,000.

Faced with mounting financial pressure, defendant negotiated with Trustco to pay $1.5 million of FRFC's debt to Trustco by January 1991. FRFC also planned to repay ILA $600,000. To raise the money, defendant connected ILA and FRFC with John Googe, a Winston-Salem businessman with an interest in Air-Lift Associates (ALA), a company at the Raleigh-Durham airport. Defendant proposed that ILA take a mortgage on a leasehold interest held by ALA. Edward Shugart, a consulting actuary initially hired as president of ILT, later became president and director of both ILA and FRFC. Shugart and defendant devised a plan under which ILA loaned Googe an additional $2.5 million, using another of Googe's companies, Southeastern Employee Benefit Services (SEBS), as collateral. Googe immediately used the SEBS loan to purchase $2.5 million of FRFC's preferred stock, for which a dividend was to be paid to Googe periodically. Both loans were closed the same day. Simultaneously, defendant signed two interlocking "side letters," which provided that SEBS could force FRFC to repay the $2.5 million if ILA attempted to proceed against the collateral for the ALA loan. From the proceeds of the

sale of its stock to Googe, FRFC paid Trustco $1.6 million, paid ILA $637,000, and paid a company controlled by defendant $77,000.

When the Department discovered the true nature of the ALA/SEBS loans, it ordered them rescinded. However, the terms of the loans prevented recision by ILA. FRFC also re-dated its service agreement with ILA, which effectively wiped out $2 million of FRFC's debt, an asset on ILA's books. Without that asset, ILA's capital and surplus fell below the minimum level required by law. In addition, defendant held on to the limited partnership units he and his brother had contributed to ILA, causing them to lose their value. To make matters worse, FRFC transferred the SEBS loan to a reinsurance company as consideration for reinsurance. FRFC then stopped paying dividends on the preferred stock purchased by Googe, causing ALA and SEBS to default on their loans. When the SEBS loan failed and the reinsurer discovered the nature of the loans, it dropped ILA's coverage. As a result of these events, defendant put ILA in liquidation in April 1993.

On 2 April 1993, the Honorable James E. Long, in his capacity as Commissioner of Insurance of the State of North Carolina, was appointed as liquidator of ILA according to the provisions of Chapter 58 of the North Carolina General Statutes. Pursuant to his statutory powers as liquidator, Commissioner Long filed a complaint naming James D. Peterson and others as defendants. The complaint alleged two causes of action against defendant Peterson: Count II stated a claim for damages resulting from defendant's breach of fiduciary duties as a corporate director and officer, and Count V stated a claim for damages proximately caused by negligent mismanagement of the liquidated insurer. The parties waived their right to a jury trial, and this matter was heard before the Honorable L. Bradford Tillery, who, on 7 April 1998, entered judgment awarding over $7 million in damages to plaintiff. From this judgment, defendant Peterson appeals.

Defendant challenges certain of the trial court's findings of fact and conclusions of law. "On appeal, the findings of fact made below are binding on this Court if supported by the evidence, even though there be evidence to the contrary. Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." *Food Town Stores v. City of Salisbury,* 300 N.C. 21, 25-26, 265 S.E.2d 123, 126-27 (1980) (citations omitted). Furthermore, our Supreme Court has stated,

Where, as here, a case is tried without a jury, the fact-finding responsibility rests with the trial court. Absent a total lack of substantial evidence to support the trial court's findings, such findings will not be disturbed on appeal. The essential ingredient here is "substantial" evidence. The trial court's findings need only be supported by substantial evidence to be binding on appeal. We have defined "substantial evidence" as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

*Pulliam v. Smith*, 348 N.C. 616, 625, 501 S.E.2d 898, 903 (1998) (citations omitted). As there was substantial evidence to support the trial court's findings and as we conclude its conclusions are correct, we affirm the trial court's decision.

## I. Standing

[1] Defendant first contends that plaintiff lacks standing to bring suit on behalf of policyholders and creditors under N.C. Gen. Stat. § 58-30-120 (1994). He argues that North Carolina recognizes no cause of action by a policyholder and only very limited causes of action by a creditor against an insurance company's officers or corporate directors. Defendant asserts that under these facts, neither creditors nor policyholders could prosecute actions on their own behalf and that plaintiff, as liquidator, may not do so either. While North Carolina Appellate Courts have not definitively addressed the issue of the duty of an officer or director of an insurance company to a policyholder, we do not reach that issue here, because plaintiff properly brought this suit on behalf of ILA.

The first paragraph of the complaint alleges that plaintiff "brings this action in his capacity as the Liquidator of the Investment Life Insurance Company of America ('ILA') and on behalf of the creditors and policyholders of ILA pursuant to the provisions of North Carolina General Statutes §§ 58-30-120(a)(12) and (13)." Section 58-30-120 is titled, "Powers of liquidator," and provides,

(a) The liquidator has the power: . . .

(12) To continue to prosecute and to institute in the name of the insurer or in his own name *any and all suits and other legal proceedings*, in this State or elsewhere, and to abandon the prosecution of claims he deems unprofitable to pursue further.

N.C. Gen. Stat. § 58-30-120(a)(12) (1994) (emphasis added). Subsection (a)(12) grants wide-ranging power to the liquidator to institute all types of suits and other legal proceedings in the name of the insurer. Defendant admits that the duties and liabilities of directors and officers run directly to the corporation and does not challenge plaintiff's standing to bring the action on behalf of ILA. Moreover, plaintiff's suit on behalf of ILA is consistent with the provisions of Article 30 of Chapter 58, which regulates liquidation of insurers. Article 30 provides:

(b) This Article shall be liberally construed to effect the purpose stated in subsection (c) of this section.

(c) The purpose of this Article is to protect the interests of policyholders, claimants, creditors, and the public generally with minimum interference with the normal prerogatives of the owners and managers of insurers . . . .

N.C. Gen. Stat. § 58-30-1(b) and (c) (1994). Construing section 58-30-120(a) liberally to effect the Article's stated purpose, we hold that the statute confers standing upon plaintiff to assert the claims of ILA against defendant. Particularly, plaintiff has standing to bring suit against defendant for breach of fiduciary duty and negligent mismanagement. Thus, we need not address the issue of the duty owed by defendant to policyholders or creditors.

## II. Statutes of Limitations

[2] Defendant next contends that plaintiff's causes of action are barred by applicable statutes of limitations. He argues that because the suit was brought on behalf of policyholders, section 58-30-130(b) does not apply. Because we have already determined that plaintiff brought this suit on behalf of ILA, we hold that section 58-30-130(b) does apply to the facts of this case. That statute states,

The liquidator may, upon or after an order for liquidation, within two years or such subsequent time period as applicable law may permit, institute an action or proceeding *on behalf of the estate of the insurer* upon any cause of action against which the period of the limitation fixed by applicable law has not expired at the time of the filing of the petition upon which such order is entered.

N.C. Gen. Stat. § 58-30-130(b) (1994) (emphasis added).

Furthermore, this Court has stated,

[U]nder G.S. § 58-30-130(b), we must first decide whether the complaint reflects that plaintiff's claims expired before filing of the petition upon which the order of liquidation was entered. If not, we must then determine whether the complaint indicates the instant action was instituted prior to running of the statute of limitations period on the respective claims alleged therein, or within two years after entry of the order of liquidation, whichever period is longer.

*State ex rel. Long v. Petree Stockton, L.L.P.*, 129 N.C. App. 432, 442, 499 S.E.2d 790, 796 (1998), *cert. dismissed*, 350 N.C. 57, 510 S.E.2d 374 (1999). Plaintiff was appointed liquidator of ILA by an order dated 2 April 1993. This suit was filed on behalf of ILA on 12 December 1994, within the two-year extension allowed by section 58-30-130(b). Thus, any causes of action not barred by the applicable statute of limitations as of 2 April 1993 were timely filed. We note that a cause of action need only survive to the date a petition for liquidation is filed; however, because the petition was not included in the record on appeal, our analysis utilizes the date of the order of liquidation and in that sense, is limited to the facts of this case.

The complaint alleged damages against defendant in Counts II and V for actions occurring after April 1990. The ALA/SEBS loans were closed on 1 January 1991, giving rise to Count II's claim for breach of fiduciary duties, which defendant concedes, and we agree, is subject to at least a three-year statute of limitations. Count V is an action for negligent mismanagement occurring after the ALA/SEBS loans and is therefore subject to a three-year statute of limitations. *See* N.C. Gen. Stat. § 1-52(5) (Cum. Supp. 1998). Because alleged acts of misconduct occurred within three years prior to the order appointing plaintiff as liquidator and because plaintiff filed these actions within two years of his appointment, Counts II and V are not barred by the applicable statutes of limitations. This assignment of error is overruled.

### III. Challenges to Findings and Conclusions

Defendant next contends that the trial court's findings of fact are unsupported by or contrary to the evidence. In his brief, defendant enumerates specific challenges to the trial court's findings pertaining to the ALA/SEBS loans, the limited partnership units, and the service

agreement. We address defendant's concerns *seriatim*, and affirm the trial court.

## (A) ALA/SEBS Loans

**[3]** Defendant contends there was insufficient evidence to support the trial court's findings that the "as-is" value of collateral for the ALA/SEBS loans was well beneath the minimum value approved by the boards of directors of ILA and FRFC. To the contrary, we find sufficient evidence to support this finding, primarily in the testimony of Ronald W. Loftis, who prepared the report appraising the collateral for the loans.

Defendant admits the court's finding that defendant failed to heed Ernst & Young's advice is "literally true," but states that it is "pregnant with an incorrect pejorative implication." Whatever the implication of the finding, there is substantial evidence to support it. The trial court found that Ernst & Young suggested the Department might not approve the ALA/SEBS loans and that defendant should provide an escape provision in the loan documents. Among the exhibits at trial was a letter that clearly stated Ernst & Young's concerns which, as the loan documents themselves indicate, fell on deaf ears.

Defendant next challenges the court's finding that the SEBS loan was subject to N.C. Gen. Stat. § 58-19-30(b)(2) (1994). He argues that the finding is a mixed matter of law and fact and is therefore reviewable *de novo*. While defendant is correct about the standard of review, we affirm the trial court's ruling. Section 58-19-30(b)(2) requires the following transactions to be approved by the Commissioner:

> Loans or extensions of credit to any person who is not affiliated, where the insurer makes the loans or extensions of credit with the agreement or understanding that the proceeds of the transactions, in whole or in substantial part, are to be used to make loans or extensions of credit to, to purchase assets of, or to make investments in, any affiliate of the insurer making the loans or extensions of credit provided the transactions equal or exceed: (i) with respect to nonlife insurers, the lesser of three percent (3%) of the insurer's admitted assets or twenty-five percent (25%) of surplus as regards policyholders; (ii) with respect to life insurers, three percent (3%) of the insurer's admitted assets; each as of the preceding December 31.

N.C. Gen. Stat. § 58-19-30(b)(2) (1994). Here, ILA's Annual Statement for the year ending 31 December 1990 reported assets worth less than

$75 million. The ILA-SEBS-FRFC transfer was worth $2.5 million and therefore exceeded the three percent (3%) requirement of section 58-19-30(b)(2)(i) or (ii). Furthermore, as Shugart testified, ILA was not impaired (having less than the required capital and surplus) as long as it maintained the $2.6 million debt of FRFC on its books. Based on this fact, the trial court could properly conclude that the ILA-SEBS-FRFC transfer of $2.5 million exceeded the twenty-five percent (25%) requirement of section 58-19-30(b)(2)(i).

In addition, defendant concedes that if the ILA loan to SEBS had been conditional upon the subsequent SEBS purchase of FRFC preferred stock, the statute would apply. The evidence before the trial court indicates that such a condition existed even though one was not expressly made in the carefully drafted loan documents. Eileen McDermott Taylor, attorney for FRFC, testified in her deposition that,

A. [O]ne could look at the transaction and know that there were loans being made to Googe affiliates and investments being made at the same time in ILA and know the statute and know that there was a potential problem there. . . .

Q. Were you aware before January 1, 1991, that ILA would not loan money to Air-Lift Associates unless SEBS borrowed money, which it would then reinvest in preferred stock of FRFC?

A. I don't think that was ever put to me bluntly.

Q. But you got that impression?

A. Yes, because the transaction—well, my views on this are a little bit colored by looking at the Air-Lift documentation way after the fact, which I think probably colored my views about whether it would have been a reasonable transaction to enter into.

But I think that the whole picture in the sense of the loans being accompanied by the stock was before us, yes.

Taylor's deposition supports the notion that the ILA loan to SEBS was conditional upon the subsequent purchase of FRFC stock, and thus, lends credence to the trial court's finding that the loan violated section 58-19-30(b)(2). Based on this evidence, we affirm this finding of the trial court.

Defendant further argues that violation of the statute did not necessarily result in a breach of his fiduciary duties as a director. The question of whether violation of the statute is a *per se* breach of

STATE EX REL. LONG v. ILA CORP.

[132 N.C. App. 587 (1999)]

defendant's fiduciary duties is moot in light of more than ample evidence supporting the trial court's finding that defendant breached his fiduciary duty to ILA. As one example, while much of the $2.5 million proceeds from the purchase of stock went primarily to pay the debt to Trustco, $77,000 went to repay a debt to a company controlled by defendant. Furthermore, if Trustco had been unable to collect from FRFC, it had recourse against defendant, who had personally guaranteed the loan. Defendant's use of proceeds from the stock purchase staved off collection efforts against his personal assets. Because this Court has held that the duty of good faith requires directors to avoid self-dealing, see *Freese v. Smith*, 110 N.C. App. 28, 38, 428 S.E.2d 841, 848 (1993), the trial court did not err in finding that defendant breached his fiduciary duties.

Defendant argues that there was no evidence to support the court's finding that defendant's management decisions caused ILA's decline. However, in the record, there is competent evidence indicating that defendant caused $2 million of FRFC's debt to ILA to be eliminated without repayment and that ILA's interest in limited partnership units declined in value due to defendant's hesitancy to sell these units. Defendant correctly argues that the "side letters" only caused one prospective purchaser to lose interest in purchasing ILA, rather than the several prospective purchasers implied in the court's findings. However, even allowing for defendant's correction, there was evidence that the "side letters" discouraged at least one potential buyer. The trial court's finding was not materially erroneous. Defendant states the trial court found he should have foreseen the default of the ALA/SEBS loans. However, a more accurate characterization of the finding is that a reasonable director with defendant's knowledge would be able to forecast default by ALA/SEBS. We find that there was evidence from which the judge, in light of defendant's experience, could evaluate the reasonableness and viability of the ALA/SEBS loans. Thus, the trial court's findings with respect to the ALA/SEBS loans are supported by substantial evidence.

(B) Limited Partnership Units

Defendant next challenges the trial court's findings as to the limited partnership units. He claims that, contrary to the trial court's findings, the Department was aware of FRFC's contribution of limited partnership assets prior to 1 December 1989. Defendant is correct; the Department did receive an amended Form A on 28 November 1989. However, the resulting discrepancy is minor and has no effect

on the outcome of the case. Regardless of when defendant gave the Department notice of the substitution, the nub of the finding is that ILA suffered damages resulting from the substitution and loss of value in the units. Evidence adduced at trial supports this finding. Furthermore, while defendant is correct about the date of notification to the Department, he is in error when he alleges that FRFC's commitment to contribute additional capital to ILA did not specify that the capital would be cash. An amendment to FRFC's Form A, which is contained in the trial exhibits, states, "FRFC will contribute from FRFC funds $5 million in Cash to the capital of ILT. . . ."

### (C) Service Agreement

Defendant next objects to the trial court's findings about the service agreement between ILA and FRFC. Initially, defendant challenges the trial court's finding that defendant never obtained a promised line of credit to secure this service agreement. He contends that the credit was in fact arranged, but because a condition to the extension of credit was not met, no credit was extended to the defendant. As the evidence at trial demonstrated, defendant represented that he would obtain credit, and the credit was not obtained. Therefore, the finding is supported by substantial evidence.

Defendant also argues that there is no evidence that he participated in a plan to re-date the service agreement, an action which resulted in a $2 million loss for ILA. However, Shugart, the president of FRFC, testified as follows:

Q Now, there's a notation here, "Ed understands agreement was approved with 1/1/90 date and Department is waiting for a quarterly showing." Is that a correct statement?

A. Yes, sir, I believe that is. . . .

Q. Well, is it also a true statement that you wanted to see if you could wait until 1/1/91 to make the agreement effective?

A. Yes, sir. . . .

Q. If ILA had expensed those expenses, paid them itself and not characterized them as an asset receivable from its parent, ILA would have been impaired and would not have had the necessary capital and surplus, correct?

[overruled objection]

A. Yes, sir, it would have.

STATE ex rel. LONG v. ILA CORP.

[132 N.C. App. 587 (1999)]

Q. Now after October of 1990, another quarterly statement was filed with the North Carolina Department of Insurance, is that correct?

A. We would have filed one as of the end of September 30. . . .

Q. Now does this quarterly statement show an admittable asset from First Republic to ILA?

A. Yes, sir, it does.

Q. In what amount?

A. $2,639,000.

Q. Is that likewise monies that had been spent by ILA for expenses that were being shown as the amount due to them from First Republic?

A. Yes, sir.

Q. And characterized as a good asset?

A. Yes, sir.

Q. First Republic didn't have $2.6 million, did it?

A. No, sir.

Q. If ILA, which had spent the money, had treated it as ILA's expense on its quarterly statement, that asset, $2.6 million would not have appeared, is that correct?

A. That's correct.

Q. And what would the effect have been on the company's required level of capital and surplus?

A. The company's capital and surplus would have been $2.6 million lower and that would have shown it to be impaired.

Q. Now did you sign this statement under oath?

A. Yes, sir. . . .

Q. Mr. Peterson was aware of the quarterly and annual financial statements that were being filed by the company, was he not?

A. Yes, sir.

Shugart went on to testify that despite realizing that FRFC would not be able to pay the debt it owed to ILA, ILA continued to maintain the debt of FRFC as an asset. This testimony and ILA's financial statements are sufficient evidence to support the trial court's finding of fact.

Defendant challenges the trial court's finding that he and Shugart "did away with" a $2.6 million debt owed by FRFC to ILA, arguing that there is no evidence to establish his participation in the debt reduction. However, ILA's annual statement for 1990 shows only $636,785 receivable from parent, subsidiaries, and affiliates, even though FRFC did not pay the service-agreement debt. Defendant is listed as ILA's Chief Executive Officer on this annual statement, and when viewed with Shugart's testimony surrounding the quarterly and annual statements, the evidence is substantial and supports the trial court's finding of defendant's complicity in the reduction. Moreover, conference notes of FRFC's attorney indicate that defendant was present at a meeting where re-dating the service agreement was openly discussed.

Defendant further alleges that there is no substantial evidence to show that he caused ILA to enter into another surplus relief agreement. Again, however, we turn to the notes and deposition of attorney Taylor. In her deposition, Taylor stated that her notes indicated that she discussed the surplus relief agreement in a conference with Stephen Bull, Ed Shugart, and defendant. She further stated that

> Jim Peterson had a practice—he was concerned about confidentiality, and he did have a practice of, if he thought that it was questionable whether a transaction would come to fruition or not, not identifying it until he was ready to say what—you know, that they were coming to the table and he thought he could close the deal.

From this evidence, a reasonable mind could conclude that defendant supported the surplus relief agreement. Thus, there is substantial evidence on which the trial court could properly base its finding.

Defendant correctly points out that no evidence exists to support the trial court's finding that he personally guaranteed to pay expenses under the service agreement. However, this is not a material error, for the record does establish that defendant agreed to secure a line of credit to cover the operating loss for 1990 but failed to do so. Thus, while the trial court erred in the detail, it was correct in basing its

finding in part on the fact that the Department and ILA relied on personal guarantees made by defendant, which he failed to honor.

In sum, although defendant has correctly pointed out a modicum of errors in the trial court's findings of fact, we find none to be material. Such errors are almost inevitable in a case of this complexity, and those identified by defendant have no effect on the court's conclusions of law. We have not addressed every objection to the trial court's findings raised by defendant in this appeal. However, because there is substantial evidence supporting the challenged findings, defendant's contention that the trial court's findings are not supported by sufficient evidence is overruled.

## IV. Business Judgment Rule

[4] Defendant next asserts that the trial court improperly concluded that defendant's actions do not fall under the shield provided by the business judgment rule. We disagree. Initially, we note that the Business Corporation Act provides, "A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section." N.C. Gen. Stat. § 55-8-30(d) (1990) (amended 1993). As with other portions of the Business Corporation Act, this section is not meant to abrogate the common law. *See Parsons v. Jefferson-Pilot Corp.*, 333 N.C. 420, 426 S.E.2d 685 (1993) (stating that the common law rule permitting shareholders of a public corporation to inspect accounting records was not abrogated by the Business Corporation Act); *Two Way Radio Service v. Two Way Radio of Carolina*, 322 N.C. 809, 370 S.E.2d 408 (1988) (recognizing common law protection of trade names beyond the provisions for corporate names in the Business Corporation Act, which expressly preserved the common law). Rather, language in section 55-8-30 demonstrates the legislative intent to draw from the common law. Subsection (a) of section 55-8-30 requires that a director discharge his duties "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner he reasonably believes to be in the best interests of the corporation." N.C. Gen. Stat. § 55-8-30(a) (1990) (amended 1993). As the official comment to this section states, the use of certain phrases "embodies long traditions of the common law." Therefore, section 55-8-30(d) does not abrogate the common law of the business judgment rule. Accordingly, proper analysis requires examination of defendant's actions in light of the statutory protections of N.C. Gen. Stat. § 55-8-30(d) (1990) (amended 1993) and the

business judgment rule, either or both of which could potentially insulate him from liability.

A leading authority on business law states,

> [The business judgment rule] operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.6, at 281 (5th ed. 1995). Additionally, this Court has held, "We are also mindful that the business judgment rule protects corporate directors from being judicially second-guessed when they exercise reasonable care and business judgment." *HAJMM Co. v. House of Raeford Farms*, 94 N.C. App. 1, 10, 379 S.E.2d 868, 873, *review on additional issues allowed*, 325 N.C. 271, 382 S.E.2d 439 (1989), *and modified, aff'd in part, rev'd in part on other grounds*, 328 N.C. 578, 403 S.E.2d 483 (1991). The evidence in the record reveals that defendant's actions were more than mere errors in judgment. Instead, he was a leading participant in a plan to benefit himself and his interests at the expense of ILA. The findings of the trial court, which we have held are based on substantial evidence, support its conclusion that defendant is not protected by the business judgment rule.

The trial court's findings also support its conclusion that defendant's actions did not comply with the requirements of N.C. Gen. Stat. § 55-8-30(d) (1990) (amended 1993). To receive the benefit of subsection (d), a director must discharge his duties in compliance with the requirements of subsection (a), enumerated above. Again, the trial court based its findings on substantial evidence, and its findings support the conclusion that defendant is liable for his actions, which failed to live up to the statutory standards.

### V. Director's Breach of Duty

[5] Defendant next argues that N.C. Gen. Stat. § 55-8-30(b) (1990) (amended 1993) excuses any breaches of his fiduciary duty as a director because he relied on the opinions of attorneys and accountants. In support of this position, defendant states that he sought and

STATE EX REL. LONG v. ILA CORP.

[132 N.C. App. 587 (1999)]

received the advice of a leading law firm in the state, that he sought and received the advice of a reliable national accounting firm, and that he relied on advice from Shugart, an experienced life insurance actuary. Plaintiff responds that defendant, although seeking and receiving advice on corporate decisions, ignored advice that was contrary to his efforts to maintain FRFC as a going concern. We conclude that the evidence in the record supports plaintiff's assertions and the trial court's conclusions. After speaking with ILA's attorney, who had expressed concern over the circularity of the ALA/SEBS loans, defendant told the attorney to defer to the judgment of Ernst & Young. In a letter dated 30 November 1990 and addressed to defendant, Ernst & Young revealed its assessment that ALA's liabilities exceeded its assets by 35% and that SEBS had "no real property, no significant personal property, and no significant assets that would have a cash market value to support a loan (mortgage on collateral) of the size contemplated." Ernst & Young suggested that "any transaction you enter contain escape provisions that enable you to call the [ALA/SEBS] loans in the event that they are determined not to be admitted assets by regulatory agencies." The same letter also advised defendant to obtain legal advice about loans to officers and directors. This letter is compelling evidence that defendant was actually aware that the ALA/SEBS loans were under-collateralized, potentially making them invalid assets under the Department's regulatory program. Despite this awareness, and despite words of caution from attorney Taylor in addition to those of Ernst & Young, defendant proceeded with the loans, leaving no way out when the Department ordered them rescinded. Thus, there was substantial evidence to support the trial court's conclusion that defendant breached his fiduciary duties and that his actions were not made in reliance on the advice of professionals.

## VI. Causation of Damages

[6] Finally, defendant argues that no damages were proximately caused by his actions. We find that there is substantial evidence to support a finding to the contrary. Defendant was a director of both a parent company (FRFC) and a subsidiary (ILA). In this role, defendant participated in and directed the decision to permit the parent to utilize funds of the subsidiary to pay the parent's debts, which he had personally guaranteed. The complaint alleged, and evidence supported, damages to ILA brought about by defendant's actions. Defendant caused ILA to enter a reinsurance agreement while ILA was impaired. The impairment arose because FRFC re-dated its serv-

ice agreement with ILA, eliminating $2 million in assets from ILA's books. While the reinsurance agreement deepened ILA's statutory insolvency, defendant continued to operate ILA in a reckless manner. Other damages resulted from losses caused by default on the ALA/SEBS loans, which resulted from FRFC's failure to pay dividends on its preferred stock. Defendant damaged ILA even further by holding on to limited partnership units until their value to ILA was significantly diminished. The evidence further established that defendant breached his duty of good faith and care by participating in these transactions. Based on the findings of the trial court, which are supported by substantial evidence, we hold that plaintiff met his burden of showing that defendant's actions proximately caused damage to ILA.

In summary, we hold that plaintiff, as liquidator of ILA, has standing to bring the causes of action in Counts II and V of the complaint against defendant on behalf of ILA. Additionally, we hold that the causes of action in Counts II and V of the complaint were timely brought against defendant. Furthermore, the material findings of the trial court are based on substantial evidence and in turn support the trial court's conclusions that defendant breached his duties as a director, that defendant is not protected by the business judgment rule, that defendant did not reasonably rely on advice from professionals, and that defendant's actions proximately caused damage to ILA. We therefore affirm the decision of the trial court.

Affirmed.

Chief Judge EAGLES and Judge WYNN concur.