RICHARD HAPP, Plaintiff v. CREEK POINTE HOMEOWNER'S
ASSOCIATION, Defendant

No. COA10-1159

(Filed 16 August 2011)

**1. Associations—homeowner's association—disbursement of litigation settlement fund**

The trial court did not err by granting summary judgment in favor of defendant homeowner's association based on its conclusion that there were no genuine issues of material fact as to whether defendant acted beyond the scope of its authority in its disbursement of funds from the settlement of the parties' previous lawsuit. The funds could not be spent once the litigation had concluded, and defendant acted in the best interest of its contributing members by returning the remaining funds.

HAPP v. CREEK POINTE HOMEOWNER'S ASS'N

[215 N.C. App. 96 (2011)]

2. **Associations—homeowner's association—ultra vires acts—construction of security gate—placement of video camera**

The trial court did not err by granting summary judgment in favor of defendant homeowner's association based on its conclusion that there were no genuine issues of material fact as to whether defendant engaged in *ultra vires* acts in its construction of a security gate and placement of a video camera at the entrance to a community. The acts constituted permissible maintenance and modification of the roads under N.C.G.S. § 47F-3-102. Further, for a minor inconvenience, the gate deterred trespassers from accessing the community.

Appeal by Plaintiff from Judgment entered 1 April 2010 by Judge Benjamin G. Alford in Pamlico County Superior Court. Heard in the Court of Appeals 24 March 2011.

*Wheatly, Wheatly, Weeks & Lupton, PA, by Claud R. Wheatly, III and Chadwick I. McCullen, for Plaintiff-appellant.*

*Cranfill Sumner & Hartzog LLP, by Katie Weaver Hartzog, for Defendant-appellee.*

HUNTER JR., Robert N., Judge.

Plaintiff Richard Happ ("Happ") appeals from a Judgment denying his Motion for Summary Judgment and granting summary judgment and declaratory relief in favor of Defendant Creek Pointe Homeowner's Association (the "Association"). Happ alleges the trial court erred as genuine issues of material fact exist as to his claims and as to the Association's counterclaims. We affirm the trial court's Judgment.

## I. Facts & Procedural History

This appeal arises out of a dispute over the Association's disbursement of the balance of a litigation fund to its members and its construction of a security gate at the entrance of the Creek Pointe Subdivision, which is located near New Bern, N.C. Happ, a resident of the Creek Pointe subdivision, brought this action alleging, *inter alia*, the Association's disbursement of funds and construction and maintenance of the security gate were *ultra vires* acts.

In the late 1980s, Weyerhaueser Real Estate Company ("Weyerhaueser") developed the Creek Pointe subdivision ("Creek Pointe") in

Pamlico County, North Carolina. Previously, Weyerhaueser used the property for forest management and timber harvesting. Creek Pointe consists of 34 wooded lots at the end of Creek Pointe Road, a six-mile dirt road. There are also numerous dirt roads located within Creek Pointe, developed at a higher grade than Creek Pointe Road for residential use.

On 14 November 1989, Weyerhaeuser filed a Declaration of Covenants, Conditions, and Restrictions (the "Declaration") applicable to the 33 lots comprising Creek Pointe "in order to provide enforceable standards for improvements and development whereby aesthetics, living conditions and property values may be enhanced." The Declaration established the Creek Pointe Homeowner's Association and requires all lot owners to be members of the Association. The Declaration further requires all members to pay annual dues of $500 per lot owned for the maintenance of Creek Pointe Road and the interior roads of Creek Pointe. These yearly assessments must be deposited into a common fund account, the "Creek Pointe Maintenance Fund," and must be used solely for: "(A) Road maintenance expenses, and (B) Administration cost[s] for enforcement thereof, including, but not limited to, accounting, attorney's fees, and court costs, and shall not be subject to partition by any individual lot owner."

Additionally, the Association's Articles of Incorporation ("AIC") state that the Association was formed to "provide for maintenance, preservation and architectural control" of the residential lots and roads within the Association and "to promote the health, safety, and welfare of the residents." In so doing, the AIC provides the Association may exercise all powers, rights, and privileges of a corporation organized under the Non-Profit Corporation Law of North Carolina. The AIC also explicitly grants to the Association the power to improve and build upon the real property of the Association.

The Association's by-laws permit the Board of Directors to use assessments collected from the residents to "employ attorneys, accountants and other professionals as the need arises." The Board of Directors may also make special assessments, subject to the provisions of the Declaration. The Board of Directors may further "adopt additional rules relating to utilization of any Lots or any common property (including any street)."

Approximately fifteen years ago, Happ purchased five lots in Creek Pointe from Weyerhaueser. Upon purchasing the property,

Happ requested permission to erect a gate, consisting of two posts connected by a chain and padlock, across the dirt road leading to his property because he lived out-of-state and wanted to deter trespassers. The Association approved Happ's request, thinking it a temporary measure until Happ moved to North Carolina. When Happ moved to North Carolina, he informed the Association that he planned to maintain the gate permanently. Due to Happ's placement of his gate, other Association members were unable to utilize the road in accordance with an easement permitting all members use of all the roads within the subdivision. Kenneth Kremer, a lot-owner and member of the Association, was also unable to access part of his property due to Happ's padlocked gate.

## A. The Parties' History of Litigation

Happ's construction of this gate in 1994 resulted in litigation between the Association and Happ. *Creek Pointe Homeowner's Ass'n v. Happ*, 146 N.C. App. 159, 161, 552 S.E.2d 220, 222 (2001), *disc. rev. denied*, 356 N.C. 161, 568 S.E.2d 191 (2002). The Association alleged Plaintiff's fence violated a restrictive covenant that granted an easement for use of the road to all subdivision residents, and filed a claim seeking an injunction requiring Plaintiff to remove the fence. *Id.* On appeal, the matter before this Court was whether the trial court properly dismissed the Association's claims for lack of standing. *Id.* at 163, 552 S.E.2d at 224. We concluded the Association did have standing to bring their claim and reversed the trial court's order. *Id.* at 169, 552 S.E.2d at 228.

The Association incurred legal bills in excess of $90,000 as a result of the litigation. The costs were paid with special assessments levied on each lot in the subdivision, including Plaintiff's lots, and through voluntary contributions from Association members; these funds were maintained in an account separate from the regular Association dues. The Association's members were not, however, willing to pay for additional litigation and the Association reached a settlement with Happ and third-party defendant Weyerhaeuser. Pursuant to the terms of the settlement, Weyerhaeuser paid $7,500 to the Association and $7,500 to Happ, and all parties dismissed all claims with prejudice.

Upon receiving the settlement proceeds from Weyerhaeuser, the Board of Directors of the Association used these funds to pay the Association's attorneys' fees. They voted to disburse the remaining funds—approximately $3,000—to the members of the Association in

proportion to each member's contribution to the litigation fund. Happ accepted a refund in the amount of $139.72. Some of the Association members elected to donate their refund to the Association for the construction of the security gate at the entrance of the subdivision. Happ did not donate his refund to the Association and has complained that he should have received a larger refund.

## B. Creek Pointe Security Gate

For a number of years, the Association alleges numerous problems with trespassers entering the interior roads of Creek Pointe. This unauthorized access resulted in substantial damage to the roads by all-terrain vehicles and property damage resulting from campfires, unauthorized parties, and littering.

In 2006, the Association constructed a security gate with lights at the entrance of Creek Pointe. To open the gate, the Association provided numeric codes to each Association member, including Happ; members also had the option of purchasing a remote control to open the gate. Happ never attempted to use the code to open the gate. Rather, upon his first encounter with the gate Happ dismantled the gate and tied it in an open position. Happ complained to other members of the Association that he did not want the gate blocking access to the subdivision; Happ was concerned that friends would not be able to visit him and couriers would not be able to make deliveries. When the Association fixed the security gate, Happ disassembled the gate again, removing additional parts to make it more difficult to reassemble. In 2008, the Association's Board of Directors voted to fix the gate and install a camera to monitor the gate. When the Association reassembled the gate, Happ used a saw to "destroy" it and threatened that if the Association repaired the gate he would destroy it again.

## C. Plaintiff's Lawsuit

Happ filed suit against the Association in Pamlico County Superior Court on 26 January 2009 seeking: (1) involuntary dissolution of the Association for the alleged misuse of corporate assets; (2) a declaratory judgment that the Association may only use assessments collected for road maintenance, not for the installation of the gate, light, and camera; (3) if the Association is not dissolved, an injunction compelling the Association to use assessments collected for road maintenance solely for that purpose; and (4) a declaratory judgment that the covenants which created the Association are unen-

forceable due to the Association's radical changes to the conditions and character of the subdivision.

The Association filed a counterclaim seeking declaratory relief that the AIC, Declarations, and by-laws of the Association allow the Association's Board of Directors to expend funds for, but not limited to, the installation and maintenance of a gate and security system at the entrance of the subdivision.

On 4 March 2010, Plaintiff filed a Motion for Summary Judgment alleging there was no genuine issue of material fact. The Association filed a Motion for Summary Judgment alleging the same, or in the alternative, a Motion to Dismiss for failure to join necessary parties. The Motions came on for hearing on 18 March 2010 in Pamlico County Civil Superior Court, Judge Benjamin G. Alford presiding. Judge Alford entered summary judgment on 1 April 2010 in favor of the Association on all claims asserted by Plaintiff and the counterclaim asserted by the Association. Plaintiff filed timely notice of appeal from this Judgment.

## II. Jurisdiction & Standard of Review

This Court has jurisdiction to hear the instant appeal pursuant to N.C. Gen. Stat. § 7A-27(b) (2009). The trial court will grant summary judgment when no genuine issues of material fact exist in a case. *Volkman v. DP Associates*, 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980); N.C. Gen. Stat. § 1A-1, Rule 56(c) (2009). The moving party bears the burden of proving there are no genuine disputes of material fact. *Leake v. Sunbelt Ltd. of Raleigh*, 93 N.C. App. 199, 201, 377 S.E.2d 285, 287, *disc. rev. denied*, 324 N.C. 578, 381 S.E.2d 774 (1989). "A movant may meet its burden by showing either that: (1) an essential element of the non-movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the movant cannot surmount an affirmative defense which would bar the claim." *Moore v. City of Creedmoor*, 120 N.C. App. 27, 36, 460 S.E.2d 899, 904 (1995), *rev'd in part on other grounds*, 345 N.C. 356 (1997) (citing *Watts v. Cumberland Cnty. Hosp. Sys.*, 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985), *rev'd in part on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986)). If the moving party meets this burden, the non-moving party must then "produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 448, 579 S.E.2d 505, 507 (2003).

The non-moving party "may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." N.C. Gen. Stat. § 1A-1, Rule 56(e). When the trial court makes a decision regarding a Motion for Summary Judgment, all evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences should be drawn in the non-moving party's favor. *Durham v. Vine*, 40 N.C. App. 564, 566, 253 S.E.2d 316, 318–19 (1979), *overruled on other grounds, Roumillat v. Simplistic Enters.*, 331 N.C. 57, 63, 414 S.E.2d 339, 342 (1992). A trial court's summary judgment ruling receives *de novo* review. *Barringer v. Forsyth Cnty. Wake Forest Univ. Baptist Med. Ctr.*, 197 N.C. App. 238, 247, 677 S.E.2d 465, 472 (2009).

## III. Analysis

On appeal, Plaintiff argues only two of the four issues he raised at trial. Specifically, he contends the trial court erred in granting summary judgment in favor of the Association because genuine issues of material fact exist as to (1) whether it acted beyond the scope of its authority in its disbursement of funds from the settlement of the parties' previous lawsuit, and (2) whether the Association committed *ultra vires* acts by constructing the security gate at the entrance of the subdivision. We disagree.

### A. Disbursement of Funds

[1] Plaintiff argues there are genuine issues of material fact as to whether the Association had the authority to distribute the remaining portion of its litigation fund at a *pro rata* rate to members who contributed to the fund. Rather, Plaintiff contends the funds should have been utilized for road maintenance in the community. We disagree.

The North Carolina Planned Community Act is the governing authority on regulation of planned communities in North Carolina. *Wise v. Harrington Grove Cmty. Ass'n*, 357 N.C. 396, 399, 584 S.E.2d 731, 734–35 (2003), *superseded on other grounds* 2005 N.C. Sess. 1598–1610 (codified as amended at N.C. Gen. Stat. § 47F-3-102). Specifically, section 47F-1-102 clarifies that the Act in its entirety applies to all planned communities established on or after 1 January 1999, and section 47F-3-102(1) to (6) and (11) to (17) also apply to communities created before 1 January 1999 as long as the events at issue occur after that date. N.C. Gen. Stat. § 47F-1-102 (2009).

Significantly, section 47F-3-102 expressly states that

> [u]nless the articles of incorporation or the declaration expressly provides to the contrary, the association may: . . . (2) Adopt and amend budgets for revenues, expenditures, and reserves and collect assessments for common expenses from lot owners . . . and (17) Exercise any other powers necessary and proper for the governance and operation of the association.

N.C. Gen. Stat. § 47F-3-102; *see also Indian Rock Ass'n v. Ball*, 167 N.C. App. 648, 650–51, 606 S.E.2d 179, 180–81 (2004) (holding that homeowners' associations can generally collect assessments to fulfill their stated duties).

Furthermore, section 47F-3-114 states that

> [u]nless otherwise provided in the declaration, *any surplus funds* of the association remaining after payment of or provision for common expenses, the funding of a reasonable operating expense surplus, and any prepayment of reserves *shall be paid to the lot owners in proportion to their common expense liabilities* or credited to them to reduce their future common expense assessments.

N.C. Gen. Stat. § 47F-3-114 (2009) (emphasis added); *see* N.C. Gen. Stat. § 47F-1-103(5) (" 'Common expenses' means expenditures made by or financial liabilities of the association, together with any allocations to reserves."). We find no provisions in the Association's Declaration, AIC, or by-laws that contradict the Association's authority under the North Carolina Planned Community Act to disburse surplus funds to its members.

When analyzing the terms of the Declaration, we interpret it as a binding contract between Weyerhauser and the purchasers of its lots. Courts have the power to enter summary judgment in contract disputes because they may interpret the terms of contracts. *See Hodgin v. Brighton*, 196 N.C. App. 126, 128–29, 674 S.E.2d 444, 446 (2009) (interpreting the terms of a contract restricting the use of residential property when reviewing an order granting partial summary judgment). "Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms." *Id.* at 128, 674 S.E.2d at 446. However, "it is a fundamental rule of contract construction that the courts construe an ambiguous contract in a

manner that gives effect to all of its provisions, if the court is reasonably able to do so." *Johnston Cnty. v. R.N. Rouse & Co.*, 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992).

In the present case, we believe there are no genuine issues of material fact as to whether the Association had the authority to disburse the remaining settlement proceeds to the members of the Association at a *pro rata* rate based on members' contributions to the litigation fund. Preliminarily, we find the North Carolina Planned Community Act applicable to the present case because members of the Association pay maintenance fees and other expenses for the benefits of real estate described in the Declaration. *See* N.C. Gen. Stat. § 47F-1-103(23) (defining a "Planned community" as "real estate with respect to which any person, by virtue of that person's ownership of a lot, is expressly obligated by a declaration to pay real property taxes, insurance premiums, or other expenses to maintain, improve, or benefit other lots or other real estate described in the declaration"). Additionally, even though Creek Pointe was established before the Act was passed, the distribution of proceeds occurred in 2005, so section 47F-3-102(2) and (17) are applicable. *See Wise*, 357 N.C. at 399–400, 584 S.E.2d at 735 (describing the provisions of the North Carolina Planned Community Act that apply to planned communities created prior to 1 January 1999). We believe the broad language of statute section 47F-3-102 authorizes the collection and distribution of funds for litigation in which a homeowners' association is a party as long as this collection and distribution is not prohibited in the Association's Declaration and AIC.

Given this statutory authorization, we next analyze whether the Declaration, AIC, or by-laws prohibit this type of collection and distribution of funds. We hold this activity is allowed. In fact, the Declaration explicitly states that assessments may be used for "[a]dministration cost for enforcement thereof, including, but not limited to, accounting, *attorneys* [sic] *fees*, and court costs, and shall not be subject to partition by any individual lot owner." (Emphasis added.) Additionally, the by-laws allow the Board of Directors the power to "employ attorneys, accountants and other professionals as the need arises" and to "make and collect assessments . . . . Special assessments, should they be required by the Board of Directors and subject always to the terms and provisions of the Covenants . . . shall be levied and paid in the same manner as hereinbefore provided for regular assessments."

Although the Declaration, AIC, and by-laws do not directly address disbursement of surplus special assessment funds to contributing members, we do not find the disbursal impermissible under those documents or N.C. Gen. Stat. § 47F-3-102(2) and (17). Furthermore, as discussed above, N.C. Gen. Stat. § 47F-3-114 explicitly allows such activity. The money was collected for the specific purpose of funding the litigation and kept in a separate account from the Association's general funds. Consequently, because the funds effectively could not be spent once the litigation had concluded, we find the Association acted appropriately in returning the remaining funds to contributing members on a *pro rata* basis.

We also believe that because the Association acted in the interest of its contributing members by returning the remaining settlement proceeds to members who contributed to the litigation fund, it acted in accordance with the business judgment rule.

> [The business judgment rule] operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.6, at 281 (5th ed. 1995). Under the business judgment rule, a Board of Directors' decision need only manifest "reasonable care and business judgment." *State ex rel. Long v. ILA Corp.*, 132 N.C. App. 587, 602, 513 S.E.2d 812, 822 (1999) (quotation marks omitted). Other jurisdictions have already applied the business judgment rule to homeowners' associations. *See, e.g., Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 724 (Col. App. 2001) ("We perceive no reason why [the business judgment rule] should not apply in this case insofar as the issue for resolution is whether the HOA fulfilled its obligation to enforce the covenants."); *Levandusky v. One Fifth Ave. Apartment Corp.*, 75 N.Y.2d 530, 538, 553 N.E.2d 1317, 1321 (1990) ("Clearly, in light of the [business judgment rule's] origins in the quite different world of commerce, the fiduciary principles identified in the existing case law—primarily emphasizing avoidance of self-dealing and financial self-aggrandizement—will of necessity be adapted over

time in order to apply to directors of not-for-profit homeowners' cooperative corporations." (citation omitted)). Additionally, in analogous case law regarding shareholder derivative disputes, we have held that according to the business judgment rule, "a shareholder will not be permitted to substitute his judgment for that of the company's management" if "the decision was made in good faith." *Swenson v. Thibaut*, 39 N.C. App. 77, 107, 250 S.E.2d 279, 298 (1978). Here, we believe the Association acted reasonably and in good faith by returning the remaining settlement proceeds to the contributing members. Happ may not substitute his judgment for that of the Association in regard to how the settlement proceeds should be managed.

We conclude that no genuine issues of material fact exist as to whether the Association acted beyond its authority in distributing the settlement proceeds to members who contributed to the litigation fund.

## B. Construction of the Security Gate

[2] Plaintiff also contends there are genuine issues of material fact as to whether the Association engaged in *ultra vires* acts in its construction of a security gate and placement of a video camera at the entrance to the community. We disagree.

As discussed above, the North Carolina Planned Community Act is the relevant statutory authority in the present situation. Specifically, "[u]nless the articles of incorporation or the declaration expressly provides to the contrary, the association may . . . [r]egulate the use, maintenance, repair, replacement, and modification of common elements." N.C. Gen. Stat. § 47F-3-102(6) (2009). " 'Common elements' means any real estate within a planned community owned or leased by the association, other than a lot." N.C. Gen. Stat. § 47F-1-103(4). Generally, "homeowners' associations have the enumerated powers [in section 47F-3-102] unless their documents expressly provide to the contrary." *Riverpointe Homeowners Ass'n v. Mallory*, 188 N.C. App. 837, 841, 656 S.E.2d 659, 661 (2008).

In the present case, we first must determine whether the relevant statute authorizes the Association's placement of a security gate and video camera at the entrance of the Creek Pointe community. Specifically, section 47F-3-102 allows a homeowners' association to "[r]egulate the use, maintenance, repair, replacement, and modification of common elements," which are defined by section 47F-1-103(4) as "any real estate within a planned community owned or leased by

the association, other than a lot." N.C. Gen. Stat. §§ 47F-3-102, 47F-1-103(4). We interpret section 47F-1-103(4) to apply to the private roads in Creek Pointe owned by Weyerhauser and maintained by the Association, and believe the roads are "common elements" subject to "maintenance, repair, replacement, and modification." However, even if the North Carolina Planned Community Act did not apply in the present situation because the roads are not directly owned or leased by the Association, common law contract principles would support the Association's authority to construct the gate and place a video camera at the entrance in accordance with the Declaration, AIC, and by-laws.

Under a plain meaning approach, we define "maintenance" as "the process of keeping something in good condition." *The New Oxford American Dictionary* 1022 (2d ed. 2005); *see Smith v. United States*, 508 U.S. 223, 228, 124 L. E. 2d 138, 148 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.") We also define "modification" as "the action of modifying something," and define "modify" as "mak[ing] partial or minor changes to (something), typically so as to improve it." *Id.* at 1090. Here, the gate and video camera helped deter trespassers whose all-terrain vehicles caused damage to the roads in Creek Pointe. We thus conclude the construction of the security gate and placement of the video camera constitute permissible "maintenance" and "modification" of the roads under section 47F-3-102(6) because they helped keep the roads in good condition.

Next, we analyze whether the Declaration, AIC, or by-laws expressly prohibit the placement of the security gate and video camera. We believe they do not. The Declaration even explicitly authorizes the Association to use assessments to pay for "Road maintenance expenses," and the AIC allow the Association to "improve, build upon, operate, [and] maintain" "real or personal property in connection with the affairs of the Association." The by-laws also grant the Board of Directors the authority "to use and expend the assessments collected to carry out the purposes and powers of the Association" as defined in the Declaration and "to purchase supplies and equipment." In the absence of express prohibition of the activity in question, we conclude that there are no genuine issues of material fact as to whether the Association could construct a security gate and place a video camera at the entrance of the Creek Pointe Community.

We find unconvincing Plaintiff's reliance on *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 633 S.E.2d 78 (2006) to argue the

Association unreasonably changed the character of the subdivision and increased the obligations of its members, and we distinguish *Armstrong* on two grounds. First, in *Armstrong*, our Supreme Court expressly stated that the homeowners' association at issue was not subject to the North Carolina Planned Community Act. 360 N.C. at 548, 633 S.E.2d at 81. Additionally, the homeowners' association in *Armstrong* amended its by-laws and declaration. *Id.* at 551–52, 633 S.E.2d at 83. Plaintiff states "[t]he only difference in the facts" of the two cases "is that [here] the Appellee-Homeowner's Association is not attempting to amend the Declaration or By-Laws." We find this to be a significant difference.

In *Armstrong*, our Supreme Court held that an amendment to a homeowners' association's declaration must be reasonable to be upheld against members who joined the association before the amendment was passed. 360 N.C. at 548, 633 S.E.2d at 81. In order to protect members from *ex post* obligations that they did not intend to incur at the time of contract, *Armstrong* clarifies that "every amendment must be *reasonable* in light of the contracting parties' original intent." *Id.* at 559, 633 S.E.2d at 87 (footnote omitted). In the present case, there was no amendment to the Declaration, AIC, or by-laws. In summary, while the homeowners' association members in *Armstrong* faced new obligations imposed by amendments that they did not agree to at the time of contract, in the present case we interpret the Declaration, AIC, and by-laws, agreed upon by the Association members, to determine exactly what powers are granted to the Association.

Nor are we persuaded by Plaintiff's argument that the gate interfered with Happ's easement permitting use of the roads in the community. The Declaration establishes "an easement for ingress [and] egress" on all private roads in Creek Pointe for all members of the community. Plaintiff erroneously relies on *Williams v. Abernethy*, 102 N.C. App. 462, 402 S.E.2d 438 (1991), to argue that the gate unreasonably interfered with his easement. *Williams* holds that where the easement does not address the creation of a gate on a road, "the servient estate may maintain a gate across the right-of-way if necessary for the servient estate and if it does not unreasonably interfere with the right-of-way use." *Id.* at 465, 402 S.E.2d at 440 (quotation marks omitted). However, *Williams* was decided before the North Carolina Planned Community Act was passed, and while common law property principles are still applicable in areas not regulated by statutes, "[w]hen the General Assembly as the policy making agency

of our government legislates with respect to the subject matter of any common law rule, the statute supplants the common law and becomes the law of the State." *News and Observer Publ'n Co. v. State ex rel. Starling*, 312 N.C. 276, 281, 322 S.E.2d 133, 137 (1984). However, when statutes are in derogation of common law principles, they must be strictly construed. *Turlington v. McLeod*, 323 N.C. 591, 594, 374 S.E.2d 394, 397 (1988). "Strict construction of statutes requires only that their application be limited to their express terms, as those terms are naturally and ordinarily defined." *Id.* We believe that the North Carolina Planned Community Act, construed strictly with regard to common law principles of easements, permits the Association to construct a security gate and place a video camera as part of its "maintenance" of the roads in the community.

Furthermore, we do not believe the construction of the gate and placement of a video camera constituted an unreasonable interference with Plaintiff's use of his easement. *See Shingleton v. State of North Carolina*, 260 N.C. 451, 458, 133 S.E.2d 183, 188 (1963) ("[T]he maintenance of a gate, even a locked gate, would not necessarily be inconsistent with plaintiff's rights so long as the use of the road by himself and his agents, servants, employees and licensees is not unreasonably interfered with thereby."). Members of the community were provided with numeric key codes to access the gate, and were even given the opportunity to purchase a remote control to open the gate. For this minor inconvenience, the gate deterred trespassers, including all-terrain vehicles, partiers, and littering campers, from accessing the community. In light of the benefits of the security gate, we do not find unreasonable the minor inconvenience of entering a numeric code or using a remote control to open the gate. Additionally, because emergency personnel were provided with the numeric code, and members of the Association are allowed to provide the code to guests, we find Plaintiff's additional arguments on this issue unconvincing.

Consequently, we conclude there are no genuine issues of material fact as to whether the Association acted outside its authority in constructing the security gate and placing a video camera at the entrance to the community.

## IV. Conclusion

We find no genuine issue of material fact regarding Plaintiff's claims that the Association acted beyond the scope of authority in disbursing the remaining litigation funds and engaged in *ultra vires*

acts by constructing a security gate at the entrance to the community. The trial court appropriately granted Defendant's Motion for Summary Judgment and we affirm the trial court's Order.

Affirmed.

Judges STROUD and THIGPEN concur.