Frye Reg'l Med. Ctr., Inc. v. Blue Cross Blue Shield of N.C., Inc., 2020 NCBC 33.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>COUNTY OF CATAWBA<br><br>FRYE REGIONAL MEDICAL CENTER, INC.,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>BLUE CROSS BLUE SHIELD OF NORTH CAROLINA, INC.,<br><br>　　　　　　　　Defendant. | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>18 CVS 783<br><br><br><br>**ORDER & OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND BCBSNC'S MOTION TO EXCLUDE EXPERT TESTIMONY** |

THIS MATTER comes before the Court on Plaintiff Frye Regional Medical Center, Inc.'s ("Frye") Motion for Partial Summary Judgment ("Frye Motion," ECF No. 73 [SEALED])[1], and Defendant Blue Cross Blue Shield of North Carolina, Inc.'s ("BCBSNC") Motion for Summary Judgment ("BCBSNC Motion," ECF No. 79; collectively, the Frye Motion and the BCBSNC Motion are referred to as the "Motions"). Additionally, this matter is before the Court on BCBSNC's Motion to Exclude Expert Testimony. ("Motion to Exclude," ECF No. 68.)

THE COURT, having considered the Motions, the evidentiary materials filed by the parties, the briefs in support of and in opposition to the Motions, the arguments of counsel at the hearing on the Motions, and other appropriate matters of record,

---

[1] The Frye Motion, nine briefs, and all of the evidentiary materials filed by the parties in relation to the parties' motions for summary judgment and BCBSNC's Motion to Exclude Expert Testimony were provisionally filed <u>completely</u> under seal. Two briefs were filed under seal and in public, redacted form. The Court has determined that certain of the information contained in the provisionally filed briefs and exhibits should be unsealed as set out in this Court's Order on Motions to Seal (ECF No. 117).

concludes that BCBSNC's Motion should be GRANTED, in part, and DENIED, in part, and that Frye's Motion should be DENIED, for the reasons set forth below. The Court further DENIES the Motion to Exclude.

> *Young, Morphis, Bach & Taylor, LLP, by Paul E. Culpepper for Frye Regional Medical Center, Inc.*
>
> *Lash & Goldberg LLP, by Alan D. Lash, Justin C. Fineberg, Christopher K. Smith, and Matthew G. Frias for Frye Regional Medical Center, Inc.*
>
> *Williams Mullen, by Ruth Levy, John Holton, Elizabeth C. Stone, and Keith M. Kapp for Blue Cross Blue Shield of North Carolina, Inc.*

McGuire, Judge.

   *A. Motion to Exclude*

   1.     Prior to considering the Motions, the Court will briefly address BCBSNC's Motion to Exclude. On October 10, 2019, BCBSNC filed the Motion to Exclude along with a brief and evidentiary materials in support. (ECF No. 68; Br. in Supp. of Mot. to Excl., ECF No. 69 [SEALED]; Evid. in Supp., ECF No. 69.1 [SEALED].) On October 17, 2020, BCBSNC filed a public, redacted version of its brief in support of the Motion to Exclude.  (Redacted Br. in Supp. of Mot. to Excl., ECF No. 82.) Pursuant to North Carolina Business Court Rule 7 and N.C. R. Evid. 702, BCBSNC seeks to partially exclude the expert testimony and expert report of Frye's expert, Christopher Flanagan. (ECF No. 68.) On October 30, 2019, Frye filed a brief in opposition to the Motion to Exclude and evidence supporting Frye's opposition to the Motion to Exclude. (Br. in Opp. to Mot. to Excl., ECF No. 86 [SEALED]; Evid. in Opp., ECF Nos. 86.1–86.4 [SEALED].)  On November 12, 2019, BCBSNC filed a reply brief. (Reply Br., ECF No. 98 [SEALED].) The Court has thoroughly considered the

Motion to Exclude, the briefs and evidentiary materials filed in support of and in opposition to the Motion to Exclude, and other appropriate matters of record, and concludes, in its discretion, that the Motion to Exclude should be DENIED.[2]

## I.  FACTS

2.      "The Court does not make findings of fact when ruling upon a motion for summary judgment. But to provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at \*6 (N.C. Super. Ct. Sept. 26, 2017).

### A.  *Frye, BCBSNC, and the Network Participation Agreement*

3.      Frye operates an acute care hospital in Hickory, North Carolina. BCBSNC is a North Carolina corporation that provides medical insurance coverage to BCBSNC members. (Complaint, ECF No. 3, at ¶¶ 4–5.)

4.      On or about January 1, 2013, Frye entered into a Network Participation Agreement ("NPA") with BCBSNC that provided the terms and conditions under which Frye would provide medical care services to BCBSNC's members and BCBSNC would pay agreed-to amounts for those services. (*Id.* at ¶ 6; "NPA," EFC No. 80.1 at Ex. 1, pp. 1–61 [SEALED]; hereinafter all references to the NPA and its attachments are to "NPA" with appropriate page number(s).) The NPA provides that "[f]or Covered Services provided to [BCBSNC] Members . . . [Frye] will be paid in accordance with the attached Reimbursement Exhibit(s)." (NPA at p. 7 [SEALED].)

---

[2] The Court's denial of the Motion to Exclude is WITHOUT PREJUDICE to BCBSNC's right to make further evidentiary motions regarding Frye's expert evidence at trial.

The NPA provides that Frye will be paid for certain Inpatient Covered Services at a "Per Case Rate." (ECF No. 3, at ¶ 17, 29; NPA at pp. 22–24 [SEALED].) The Per Case Rate is defined, in relevant part, as "[t]he negotiated monetary amount set forth in Attachment 1 of this Reimbursement Exhibit." (NPA at p. 19 [SEALED].) Each "Per Case Rate" in Attachment 1 is linked to at least one Diagnostic Related Group ("DRG"). (*Id.* at pp. 22–24 [SEALED]; ECF No. 3, at ¶ 18.)

5. A DRG is defined as a "system of medically meaningful and statistically significant groupings of hospital admissions. Each such grouping is a DRG. Such classification is determined by principal and secondary diagnoses, surgical procedures, patient age, sex, and discharge status." (ECF No. 3, at ¶ 18.) The DRG classifications are widely used by hospitals and insurers. *See Diagnosis Related Group (DRG) Codes,* FIND-A-CODE, https://www.findacode.com/drg/drg-diagnosis-related-group-codes.html (last visited Apr. 15, 2020). Pursuant to the NPA, BCBSNC agreed to pay Frye for Obesity Surgery grouped as DRG 288 at a Per Case Rate of $24,300.00. (ECF No. 3, at ¶¶ 17, 29.) DRG 288 is the grouping code for "OR procedures for obesity." (*Id.* at ¶¶ 19, 30; BCBSNC Answer, ECF No. 15, at ¶ 30.) It is undisputed that "OR procedures for obesity" includes laparoscopic vertical (sleeve) gastrectomy or "bariatric surgery." (ECF No. 3, at ¶ 19; ECF No. 15, at ¶ 19.)

*B. The Coding and Invoicing Process*

6. Under the NPA, Frye provided medical services to patients who were BCBSNC members. For surgical procedures, including bariatric surgery, Frye would seek pre-authorization from BCBSNC before performing the procedure. (ECF No. 3,

at ¶ 20; ECF No. 15, at ¶ 20.) It is undisputed that BCBSNC authorized each of the procedures involved in the claims in this case. (Marti Aff., ECF No. 73.1 at Ex. 1, ¶ 9 [SEALED].)

7. After Frye discharged the patient, a Frye employee reviewed the patient's record and completed a claim form ("UB-04 form") for submission to BCBSNC seeking payment. (*See, e.g.*, UB-04 forms, ECF No. 73.1 at Ex. 1, Exs. B, D [SEALED].) The Frye employee assigned and placed on the UB-04 form what are called "ICD-9 codes." (ECF No. 3, at ¶ 21; Flanagan Dep., ECF No. 80.1 at Ex. 2, p. 27 [SEALED]; Marti Aff., ECF No. 73.1 at Ex. 1, ¶ 11 [SEALED].) ICD-9 refers to the International Classification of Diseases, Ninth Edition, a set of standardized codes used by hospitals and insurance providers. (ECF No. 3, at ¶ 21); *see ICD-9-CM*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/nchs/icd/icd9cm.htm (last visited Apr. 15, 2020). Each patient was assigned an ICD-9 code for a medical diagnosis and an ICD-9 code for the service they received.

8. The Frye employee then entered the ICD-9 codes, and other information relevant to the patient's diagnosis and treatment, into a software program that "mapped" the information to a particular DRG. At all times relevant to this dispute, Frye used a mapping program provided by ██████████████████████████████ ██████████

9. This information was ██████████████████████████████ ██████████████████████████████████ (Marti Dep., ECF No. 80.1 at

Ex. 4, p. 22 [SEALED].) ██████████ submitted the UB-04 forms to BCBSNC. (*Id.*; *see also* ECF No. 73.1 at Exs. B, D [SEALED].)

10.     Once BCBSNC received the UB-04 forms, it ran the ICD-9 codes and other information contained in the forms through its own mapping software which also mapped the ICD-9 codes to particular DRGs. (Flanagan Dep., ECF No. 80.1 at Ex. 3, pp. 67, 86 [SEALED]; McMenamin Dep., ECF No. 73.1 at Ex. 4, p. 32 [SEALED].) BCBSNC asserts, and Frye does not dispute, that BCBSNC pays claims based upon the DRG grouping assigned to a claim by BCBSNC's mapping software and not based on the DRG grouping provided by Frye. (Cooper Dep., ECF No. 73.1 at Ex. 3, p. 109 [SEALED].) During the period relevant to this case, BCBSNC used a mapping program  provided by ██████████████████████ Based on the DRG group to which the claim mapped, BCBSNC then reimbursed Frye and provided Frye with an explanation of payment and an explanation of benefits. (Kroliczak Dep., ECF No. 80.2 at Ex. 15, p. 73 [SEALED].)

*C.  The Obesity Surgery ("Section 2.4") Claims*

11.     The NPA contains the following provision regarding payment for obesity surgery relevant to this dispute:

> 2.4     The Following DRGs shall be classified as Obesity Surgery: 288
>
> 2.4.1. The Allowed Amount will be equal to the Per Case Rate.
>
> 2.4.2. The Per Case Rate for the period beginning January 1, 2013 shall be equal to <u>Twenty-Four Thousand, Three Hundred</u> dollars ($24,300)[.]

("Section 2.4," NPA at p. 22 (emphasis in original) [SEALED]; ECF No. 3, at ¶¶ 17–18.) Section 2.4 was amended two different times relevant to this lawsuit: In January 2014, the parties amended Section 2.4, increasing the Per Case Rate associated with the provision of DRG 288 services to ████████ (NPA First Amend., ECF No. 73.1 at Ex. 7 [SEALED]), and on August 15, 2015, setting the Per Case Rate at ████████ ███████████████████████████████[3] (NPA Second Amend., *id.* at Ex. 8 [SEALED].)

12. From January 2013 through March 2014, Frye submitted ████████ UB-04 forms to BCBSNC for bariatric surgery performed on its members that contained the ICD-9 diagnosis code ████████████████ and the ICD-9 procedure code ████ ██████████████████████████ (ECF 73.1 at Ex. 1, Ex. D [SEALED].) However, Frye's mapping software did not map the claims to DRG 288 (obesity surgery), but instead mapped them to DRG 292 ("Other endocrine, nutrit & metab OR proc w cc [with complication]") or DRG 293 ("Other endocrine, nutrit & Metab OR proc w/o cc [without complication]").[4] (ECF No. 3, at ¶¶ 21–22, 33–35; NPA at p. 39 [SEALED].) As a result, the UB-04 forms submitted by Frye contained the DRG 292 or DRG 293 grouping. (ECF 73.1, at Ex. 1, Ex. D [SEALED].) Frye claims that its software improperly mapped the ICD-9 codes to DRG 292 and DRG 293, and not DRG 288,

---

[3] ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████

[4] The DRG 292 and 293 grouped claims are not paid at a Per Case Rate under the NPA, but instead are paid at a much lower rate of payment to Frye.

because of an "industry-wide" software issue, but has not provided any competent evidence to support the existence of such an industry-wide issue.

13.     It is undisputed that BCBSNC paid Frye at the applicable Per Case Rate contained in Section 2.4 for the ████████ claims submitted from January 2013 through March 2014, despite the fact that the UB-04 forms contained DRG 292 and DRG 293, and not DRG 288, groupings. (ECF No. 3, at ¶¶ 23, 35; List of obesity surgery claims paid from January 2013–March 2014, ECF No. 73.1, at Ex. F [SEALED].) BCBSNC claims this is because its mapping software mapped the ████ ████ claims to DRG 288 but has not provided any evidence to support this claim.

14.     Beginning in April 2014, and through August 15, 2015, Frye submitted sixty-four UB-04 forms to BCBSNC for obesity surgery performed on its members. (ECF No. 3, at ¶¶ 24–25; ECF No. 84, at p. 4.) Each of the forms contained the same ICD-9 diagnosis code ████████████████ and the ICD-9 procedure code ████ ████████████████████ as the previous ████████ claims. (ECF No. 73.1 at Ex. 1, Ex. B [SEALED].) Again, Frye's mapping software did not map the claims to DRG 288, but instead mapped them to DRG 292 or DRG 293, and the UB-04 forms submitted by Frye contained the DRG 292 or DRG 293 grouping. (*Id*.) BCBSNC did not pay the sixty-four claims at the DRG 288 Per Case Rate, but instead paid them at the lower DRG 292 and DRG 293 rates. (List of obesity surgery claims paid from April 2014–August 15, 2015, ECF 73.1 at Ex. E [SEALED]; these 64 claims are hereinafter referred to the "Exhibit A Claims"; *see* ECF No. 3, at ¶ 24; ECF No. 84, at p. 4.) BCBSNC has offered no evidence nor an explanation for why it ceased paying

the obesity surgery claims at the DRG 288 Per Case Rate and started paying the claims at the DRG 292 and DRG 293 rates.

### D. The Exhibit B Claims

15. In addition to the Exhibit A Claims, Frye also alleges that there is a second set of claims at issue in this case for which Frye was underpaid (the "Exhibit B Claims"). (ECF No. 3, at ¶¶ 40–46; ECF No. 84, at p. 5; ECF No. 80.1 at Ex. 7 [SEALED].) The Exhibit B Claims consist of forty-four (44) claims for Covered Service of various types, other than obesity surgery, performed by Frye on BCBSNC members, which were also allegedly underpaid. (ECF No. 3, at ¶¶ 41–45; ECF No. 84, at p. 5; Marti Aff., ECF No. 90.8, at ¶¶ 7–18, attached exhibits [SEALED].)

### E. Frye's Sale of its Assets

16. On November 2, 2015, Frye entered into an Asset Purchase Agreement ("APA") with Duke LifePoint Healthcare ("DLP"). (Asset Purch. Agreem., ECF No. 80.1 at Ex. 9 [SEALED]; ECF No. 15, at p. 7.) The APA expressly excluded from the assets being sold, ████████████████████████████████████ ████████████████████████████████████. (ECF No. 80.1 at Ex. 9, pp. 9–10 [SEALED].) BCBSNC was not a party to the APA, and there is no evidence in the record that BCBSNC was aware of the excluded assets.

17. On November 16, 2015, Frye notified BCBSNC that Frye was selling its assets to DLP. ("Asset Sale Letter," ECF No. 90.10 [SEALED].) The Asset Sale Letter stated that "[a]t the closing of the transaction, [Frye] will assign all of their respective rights, title and interest in and to the Agreements to [DLP] and [DLP] will assume

all of [Frye's] rights and obligations under the Agreements arising on and after the closing date." (*Id.* [SEALED].) In the Asset Sale Letter, Frye requested that BCBSNC consent to Frye's assignment of, *inter alia,* the NPA to DLP. (*Id.* [SEALED].) Thereafter, on January 6, 2019, BCBSNC consented to the assignment of the NPA to DLP. ("Assignment Agreement," ECF No. 80.1 at Ex. 8 [SEALED].) In the Assignment Agreement, Frye, DLP, and BCBSNC agreed to the following:



(ECF No. 80.1 at Ex. 8, ¶ 1 [SEALED].)

18.     According to BCBSNC, it was not aware that ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Cooper Aff., ECF No. 80.1 at Ex. 5, pp. 172–74, 185 [SEALED].) BCBSNC contends that based on its lack of knowledge, BCBSNC entered into a new Network Participation Agreement with DLP (the "DLP NPA") containing the following merger clause:



████████████████████████████
████ █ █████ █ █████ █████ ████
███████████████████████

(ECF No. 80.2 at Ex. 13, Ex. 1, p. 15 [SEALED].)

## II. PROCEDURAL BACKGROUND

19. This action was commenced on March 23, 2018. ("Complaint," ECF No. 3.) The action was designated as a complex business case and assigned to the undersigned on April 25, 2018. (Designation Order, ECF No. 6; Assignment Order, ECF No. 2). In the Complaint, with respect to the Exhibit A Claims, Frye asserts claims against BCBSNC for Breach of Contract and Reformation. (ECF No. 3, at ¶¶ 17–39.) With respect to the Exhibit B Claims, Frye asserts a claim against BCBSNC for Breach of Contract. (*Id.* at ¶¶ 41–46.)

20. On October 11, 2019, Frye filed the Frye Motion seeking partial summary judgment on Frye's claims against BCBSNC for Breach of Contract and Reformation with regard to the Exhibit A Claims only. (ECF No. 73 [SEALED].) Frye incorporated its brief in support into the Frye Motion. (Frye Br. in Supp. SJ., ECF No. 73 [SEALED].) Frye also filed evidentiary materials in support of the Frye Motion. (Pl.'s Materials in Supp. SJ., ECF No. 73.1 [SEALED].) On the same date, BCBSNC filed the BCBSNC Motion seeking summary judgment on all claims asserted against BCBSNC by Frye. (ECF No. 79.) BCBSNC also submitted a brief in support of the BCBSNC Motion (BCBSNC's Br. in Supp., ECF No. 80 [SEALED]) and supporting materials (BCBSNC's Materials in Supp. SJ., ECF Nos. 80.1–80.2 [SEALED].) On October 17, 2020, BCBSNC filed a public, redacted version of its brief

in support of the BCBSNC Motion. (BCBSNC Redacted Br. in Supp. SJ., ECF No. 84.)

21. On November 12, 2019, Frye filed its brief in opposition to the BCBSNC Motion (Pl.'s Br. in Opp. BCBSNC Mot. SJ., ECF No. 90 [SEALED]), and multiple materials in opposition (ECF Nos. 90.1–90.10 [SEALED]). On the same day, BCBSNC filed its brief in opposition to the Frye Motion (BCBSNC's Br. in Opp. Frye Mot. SJ, ECF No. 94 [SEALED]), and multiple materials in opposition (ECF Nos. 95–95.5 [SEALED]). On November 22, 2019, BCBSNC filed its reply brief in support of the BCBSNC Motion. (BCBSNC's Reply Br., ECF No. 104 [SEALED]), and multiple materials in reply (ECF Nos. 105–105.7 [SEALED]). On the same day, Frye filed its reply brief (Pl.'s Reply Br., ECF No. 109 [SEALED]), and materials in reply (ECF Nos. 109.1–109.5 [SEALED]).

22. The Motions came before the Court for hearing on February 4, 2020 and are now ripe for decision by the Court.

III. ANALYSIS

A. *Standard of Review*

23. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S. § 1A-1, N.C. R. Civ. P. 56(c)). The moving party bears the burden of presenting evidence

which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). Where the moving party is the defendant, they may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would have been barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523, 723 S.E.2d at 747. An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

24. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). As recently reiterated by the North Carolina Court of Appeals, the burden on the non-movant goes beyond merely producing some evidence or a scintilla of evidence in support of its claims. Rather,

> [i]f the movant meets [its] burden, the nonmovant must take affirmative steps to set forth specific facts showing the existence of a genuine issue of material fact. An adverse party may not rest upon the mere allegations or denials of his pleading. A genuine issue of material fact is one that can be maintained by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind

> might accept as adequate to support a conclusion and
> means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, No. COA16-765, 2017 N.C. App. LEXIS 715, at *15 (N.C. Ct. App. Sept. 5, 2017) (citations and internal quotation marks and modifiers omitted).

### B. *BCBSNC's Affirmative Defenses*

25. The Court begins its analysis of the Motions by first addressing the arguments based on affirmative defenses raised by BCBSNC in support of its motion for summary judgment. BCBSNC argues that (1) Frye is estopped from asserting its breach of contract claims because BCBSNC detrimentally relied on Frye's representations in the Assignment Agreement; (2) some of Frye's claims are barred in whole or in part by North Carolina's three year statute of limitations for breach of contract claims; and (3) most of Frye's claims are barred by section 4.7 of the NPA which provides that ██████████████████████████████████████ ██████████████████████████████████████████ ("Payment Adjustment Provision"). The Court addresses each argument in turn.

### i. Estoppel and Detrimental Reliance

26. BCBSNC argues that pursuant to the Assignment Agreement: "Frye represented to [BCBSNC] that ██ ████████ ████████ ██████ ████████ ██████████████████████████████; that BCBSNC was unaware that the APA ██████████████████████████████████████ █████████████████; and that based on Frye's alleged misrepresentation, BCBSNC entered into the DLP NPA, "in direct reliance ██████████████████████████

████████████████████████████████████████████ (ECF No. 80, at pp. 6–12 [SEALED].)

27. Frye argues that the evidence shows that it explicitly notified BCBSNC that Frye was ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████. (ECF No. 90, at p. 13 [SEALED].) Moreover, Frye argues that BCBSNC cannot show any prejudice because ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ (ECF No. 90, at pp. 14–15 (emphasis in original) [SEALED].)

28. The doctrine of equitable estoppel applies

> when any one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

*Whitacre Partnership v. Biosignia, Inc.*, 358 N.C. 1, 17, 591 S.E.2d 870, 881 (2004) (quotation marks omitted).

29. The doctrine of equitable estoppel requires evidence of the following elements:

> 1. Words or conduct by the party against whom the estoppel is alleged, amounting to a misrepresentation or concealment of material facts.

2. The party against whom the estoppel is alleged must have knowledge, either actual or implied, at the time the representations were made, that they were untrue.

3. The truth respecting the representations so made must be unknown to the party claiming the benefit of the estoppel at the time they were made and at the time they were acted on by him.

4. The party estopped must intend or expect that his conduct or representations will be acted on by the party asserting the estoppel, or by the public generally.

5. The representations or conduct must have been relied and acted on by the party claiming the benefit of the estoppel.

6. The party claiming the benefit of the estoppel must have so acted, because of such representations or conduct, that he would be prejudiced if the first party be permitted to deny the truth thereof.

*Yancey v. Watkins*, 2 N.C. App. 672, 674–75, 163 S.E.2d 625, 626–27 (1968) (citation and quotations omitted).

30. The Court concludes that there are disputed issues of fact that prevent entry of summary judgment in BCBSNC's favor on its estoppel defense. First, the pertinent documents are, at best, confusing and do not clearly establish that Frye made any misrepresentation. The Asset Sale Letter states that ███████████████ ███████████████████████████████████████████████, but the Assignment Agreement, executed by both Frye and BCBSNC contains seemingly contradictory language stating that ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ (ECF

No. 80.1 at Ex. 8, ¶ 1 (emphasis added) [SEALED].) The intent of this language is hotly disputed.

31. In addition, BCBSNC has not presented evidence that it acted based on Frye's alleged misrepresentation such that BCBSNC was prejudiced. BCBSNC argues that it relied on the Assignment Agreement when negotiating and entering into the DLP NPA (ECF No. 80, at p. 11 [SEALED]), but has not presented evidence that it was prejudiced because, for example, ███████████████████████ ████████████████████████████████████ . Therefore, to the extent BCBSNC moves for summary judgment based on the defense of equitable estoppel, the BCBSNC Motion should be DENIED.

ii. Statute of Limitations

32. In North Carolina, an action for breach of contract must be brought within three years. N.C.G.S. § 1-52(1). "The statute begins to run when the claim accrues; with a breach of contract action, the claim accrues upon breach." *Abram v. Charter Medical Corp.*, 100 N.C. App. 718, 721, 398 S.E.2d 331, 333 (1990); *see also Silver v. North Carolina Board of Transp.*, 47 N.C. App. 261, 266, 267 S.E.2d 49, 53–54 (1980).

33. BCBSNC argues that a portion of Frye's claims are barred by North Carolina's statute of limitations for breach contract actions because Frye failed to prosecute those claims within three years of receiving notice from BCBSNC that the claims were being paid in an improper amount. (ECF No. 80, at pp. 21–23 [SEALED].) Therefore, since the lawsuit was filed on March 23, 2018, BCBSNC

contends that any claims for which Frye received notice of an alleged underpayment before March 23, 2015, are barred by the statute of limitations.

34. Frye does not dispute that its breach of contract action was filed more than three years after receiving notice of payment regarding some of its claims. (ECF No. 90, at pp. 15–16 [SEALED].) Instead, Frye argues that all of its claims are timely because BCBSNC's alleged underpayments began in April 2014, and under the continuing wrong doctrine "each underpayment was part of a pattern of continuing misconduct causing new damages." (ECF No. 90, at p. 16 [SEALED].) Accordingly, Frye maintains that "the statute of limitation[s] should be tolled until the last of such misconduct for all such claims, which occurred in August 8, 2015." (*Id.* [SEALED].)

35. Frye's understanding of the continuing wrong doctrine is misplaced. This Court recently analyzed the continuing wrong doctrine, noting that:

> With respect to the continuing wrong doctrine and its impact on a statute of limitations analysis, the North Carolina Supreme Court recently clarified that although the doctrine has sometimes been treated as an exception to the rules governing the operation of statutes of limitation, "such a description of the doctrine in question is a misnomer given that the 'continuing wrong' doctrine does nothing more than provide that the applicable limitations period starts anew in the event that an allegedly unlawful act is repeated." *Quality Built Homes Inc. v. Town of Carthage*, 371 N.C. 60, 70, 813 S.E.2d 218, 226 (2018). In other words, the continuing wrong doctrine does not restart the statute of limitations period for earlier unlawful acts, it just provides that the limitations period starts anew for subsequently committed unlawful acts of the same nature.

*Gregory Lau & Vent Tech Corp. v. Constable*, 2019 NCBC LEXIS 71, at *19–20 (N.C. Super. Ct. Sept. 24, 2019).

36. Accordingly, North Carolina courts consistently hold that when the continuing wrong doctrine applies, it merely prevents the defendant from asserting that the statute of limitations for all claims in a "continuing wrong" began to run at the time of the first breach; and the doctrine, therefore, allows the claimant to pursue claims that accrued within the applicable statutory period preceding the date of filing. *Marzec v. Nye,* 203 N.C. App. 88, 94–95, 690 S.E.2d 537, 542 (2010) (concluding that a new breach of fiduciary duty claim accrued each time the defendant failed to pay the plaintiff his monthly salary, and that the plaintiff's breach of fiduciary duty claim was timely as to the defendant's failure to pay the plaintiff's salary "during the three years preceding the filing of the action"); *Faulkenbury v. Teachers' & State Employees' Ret. Sys. of N.C.,* 345 N.C. 683, 695, 483 S.E.2d 422, 429–30 (1997) (concluding that under a continuing wrong theory, plaintiffs were permitted "to pursue claims for underpayments for three years before they commenced actions").

37. Here, the evidence shows that BCBSNC's alleged underpayment of claims began in April 2014 and continued until August of 2015. (ECF No. 73.1 at Ex. A.) Under the continuing wrong theory, each time BCBSNC allegedly underpaid a claim, a distinct and separate breach occurred, and the limitations period started anew for each specific underpayment on the date Frye received notice of the underpayment. *See Marzec,* 203 N.C. App. at 93–95, 690 S.E.2d at 542–43; *see also United States Leasing Corp. v. Everett, Creech, Hancock & Herzig,* 88 N.C. App. 418, 426, 363 S.E.2d 665, 669 (1988) (stating that the "general rule in the case of an obligation payable by installments is that the statute of limitations runs against each

installment individually from the time it becomes due"). Therefore, BCBSNC's conduct amounts to a "continuing wrong." However, contrary to Frye's argument and reliance on the continuing wrong doctrine, BCBSNC's continued conduct does not toll the limitations period for alleged underpayments that accrued in April 2014, or thereafter, until the last alleged underpayment accrued in August 2015.

38. Applying North Carolina's three year statute of limitations for breach of contract actions, Frye's claims are timely as to BCBSNC's alleged breaches that accrued on or after March 23, 2015. To the extent Frye seeks to assert its breach of contract claim for alleged breaches that accrued prior to March 23, 2015, Frye's claims are barred by N.C.G.S. § 1-52(1). A review of the Exhibit A Claims shows that 31 of the 64 claims have payment dates before March 23, 2015.[5] (ECF No. 80.1 at Ex. 6 [SEALED]; ECF No. 80.2 at Ex. 17, ¶ 11 [SEALED].) Therefore, to the extent BCBSNC's Motion seeks summary judgment in its favor on these 31 claims, the BCBSNC Motion should be GRANTED.

39. With regard to the Exhibit B Claims, BCBSNC's summary chart of those claims shows that ■ of the 44 claims have payment dates prior to March 23, 2015, and ■ claims have no payment dates. (ECF No. 80.1, Ex. 7 [SEALED].) However, the parties have presented conflicting evidence regarding the actual dates when those claims were finally resolved, and there are disputed issues of fact regarding the timeliness of each of the ■ Exhibit B Claims that precludes granting BCBSNC's Motion on these claims. (ECF No. 80.2 at Ex. 17, ¶¶ 12–13, Ex. C [SEALED]; ECF

_____

[5] The payment date is drawn from the columns labeled "Third Party Payment Date (Most recent)."

No. 90.8 at ¶¶ 8–14, Exs. C–D [SEALED].) Therefore, to the extent BCBSNC's Motion seeks summary judgment in its favor on the Exhibit B Claims, the BCBSNC Motion should be DENIED.

40.    Finally, BCBSNC has presented evidence that the Exhibit B claim for patient ██████████████, was processed and closed before March 23, 2015. (ECF No. 80.2 at Ex. 17, ¶ 16, Ex. E [SEALED].) Therefore, to the extent BCBSNC's Motion seeks summary judgment in its favor on this claim, the BCBSNC Motion should be GRANTED.

### iii.    Payment Adjustment Provision

41.    Finally, BCBSNC contends that the majority of Frye's remaining claims are barred by the Payment Adjustment Provision, which BCBSNC argues shortens the applicable statute of limitations for claims based on improper payments made under the NPA ██████████. (ECF No. 80, at pp. 17–21 [SEALED].) Specifically, BCBSNC relies on the final clause of the Payment Adjustment Provision, which states:



███████████████████████████████████████████
███████████████████████████████████████████

(NPA at p. 9 [SEALED].)

42. Frye contends that BCBSNC's position is not supported by the plain language of the provision. (ECF No. 90, at p. 17 [SEALED].) Frye argues that it



(*Id.* [SEALED].)

43. Pursuant to N.C.G.S. § 1-52(1), the statute of limitations for Frye's breach of contract claims is three years. However, "North Carolina courts have recognized contractual provisions may further limit the time in which a party may bring a cause of action." *Sanghrajka v. Family Fare, LLC*, No. COA18-164, 2019 N.C. App. LEXIS 60, at *8 (N.C. Ct. App. Feb. 5, 2019) (enforcing a one year contractual limitation period in a franchise agreement); *see also Beachcrete, Inc. v. Water St. Ctr. Assocs., L.L.C.,* 172 N.C. App. 156, 160, 615 S.E.2d 719, 722 (2005) (enforcing a one year payment limitation in a payment bond); *Beard v. Sovereign Lodge, W. O. W.*, 184 N.C. 154, 156, 113 S.E. 661, 662 (1922) (enforcing a ninety-day limitations clause in a certificate of insurance).

44. North Carolina courts clearly respect contracting parties' right to bargain for and agree to lesser limitations periods. However, in every case in which a contractually shortened limitations period has been deemed enforceable, the

language of the respective provision clearly established that it applied to the filing of lawsuits in court. *See, e.g., Beard,* 184 N.C. at 156, 113 S.E. at 662 ("No legal proceedings for recovery under this certificate shall be brought within ninety days after receipt . . . , and no suit shall be brought."); *Sanghrajka, LLC,* 2019 N.C. App. LEXIS 60, at *9 ("Any and all claims and actions arising out of or relating to this agreement . . . shall be commenced within one (1) year"); *Turning Point Indus. v. Global Furniture, Inc.*, 183 N.C. App. 119, 124, 643 S.E.2d 664, 667 (2007) ("Carrier shall be discharged of all liability . . . unless suit is brought and written notice thereof given to the Carrier within nine months"); *Beachcrete, Inc. v. Water St. Ctr. Assocs., L.L.C.,* 172 N.C. App. 156, 161, 615 S.E.2d 719, 722 ("No suit or action shall be commenced hereunder.").

45.     At first blush, the Payment Adjustment Provision appears to be harmonious with the contractual limitation provisions held to be enforceable by North Carolina courts. (*See* NPA at p. 9 [SEALED].) However, "[t]here must always be an intention to relinquish a right, advantage or benefit. The intention to waive may be expressed or implied from acts or conduct that naturally leads the other party to believe that the right has been intentionally given up." *Phoenix Ltd. P'ship v. Simpson,* 201 N.C. App. 493, 500, 688 S.E.2d 717, 722 (2009) (citations and quotation marks omitted). The Payment Adjustment Provision is void of any language—i.e., suit, action, legal proceeding—signifying the parties' intent to shorten the time in

which a proceeding in court may be brought to satisfy payment disputes arising out of the NPA. (*See* NPA at p. 9 [SEALED].)

46. A party's intent to waive or shorten the statute of limitations for wrongs committed by another contracting party should be expressed clearly, unambiguously, and explicitly. *See Beachcrete, Inc.,* 172 N.C. App. at 161, 615 S.E.2d at 722. The Payment Adjustment Provision falls short of clearly demonstrating such definitive intent. Therefore, to the extent the BCBSNC Motion seeks summary judgment based on the Payment Adjustment Provision shortening the statute of limitations, the BCBSNC Motion should be DENIED.

*C. Breach of Contract*

47. Both Frye and BCBSNC seek summary judgment on Frye's breach of contract claims alleged in Count I (Obesity Surgery Claims) of the Complaint ("Exhibit A Claims"). In addition, BCBSNC seeks summary judgment on the breach of contract claims raised in Count III (Additional Claims) ("Exhibit B Claims"). To establish a claim for breach of contract, Frye must establish (1) a valid contract, and (2) breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838 (2000). It is undisputed that the NPA constituted a valid contract. However, BCBSNC denies that it breached the terms of the NPA.

48. The Court will address the Exhibit A Claims first, followed by the Exhibit B Claims.

i.    Exhibit A Claims

49.    Determination of the Motions regarding the Exhibit A Claims turns on the interpretation of the provisions of the NPA, and particularly on Section 2.4. (NPA at p. 22 [SEALED].)

50.    It is well-settled that "[w]here the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in light of the undisputed evidence as to the custom, usage, and meaning of its terms." *Happ v. Creep Pointe Homeowner's Assoc.*, 215 N.C. App. 96, 103, 717 S.E.2d 401, 406 (2011) (alterations in original) (quoting *Hodgin v. Brighton*, 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009)). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.,* 362 N.C. 269, 273, 658 S.E.2d 918, 922 (2008) (citation omitted).

51.    "Extrinsic evidence may be consulted when the plain language of the contract is ambiguous." *Brown v. Ginn*, 181 N.C. App. 563, 567, 640 S.E.2d 787, 790 (2007) (citations omitted); *Inland Am. Winston Hotels, Inc. v. Crockett,* 212 N.C. App. 349, 354, 712 S.E.2d 366, 369 (2011). However, if the court determines that "the terms of the contract are ambiguous [and] resort to extrinsic evidence is necessary" then the question of construction of the contract is one for the jury. *Whirlpool Corp. v. Dailey Constr., Inc.,* 110 N.C. App. 468, 471, 429 S.E.2d 748, 751 (1993) (citing *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 306 S.E.2d 587 (1983)); *see also*

*Martin v. Ray Lackey Enterprises, Inc.,* 100 N.C. App. 349, 354, 396 S.E.2d 327, 330 (1990) ("[I]ntent is a question of law where the writing is free of any ambiguity which would require resort to extrinsic evidence or the consideration of disputed fact."); *Cleland,* 64 N.C. App. at 157, 306 S.E.2d at 590 ("Ambiguities in contracts are to be resolved by the jury upon consideration of 'the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time.'") (quoting *Silver v. Bd. of Trans.,* 47 N.C. App. 261, 268, 267 S.E.2d 49, 55 (1980)).

52.     Preliminarily, the provisions of the NPA relevant to determination of the Exhibit A Claims, other than the language of Section 2.4, are unambiguous. The definitions of "Covered Services" and "Per Case Rate" are clear and lead to the conclusion that the Exhibit A Claims must be paid in accordance with Section 2.4.

53.     The meaning of the language of Section 2.4, however, is hotly disputed by the parties. Section 2.4 provides:

> 2.4     The Following DRGs shall be classified as Obesity Surgery: 288
>
> 2.4.1. The Allowed Amount will be equal to the Per Case Rate.
>
> 2.4.2. The Per Case Rate for the period beginning January 1, 2013 shall be equal to <u>Twenty-Four Thousand, Three Hundred</u> dollars ($24,300)[.]

(NPA at p. 22 (emphasis in original) [SEALED].)  Frye insists that Section 2.4 reflects the parties' intent that any obesity surgery must be grouped as DRG 288 and paid at the Per Case Rate for such procedures regardless of whether the ICD-9 codes map to

DRG 288 or to some other DRG category. Frye argues that it is undisputed that each of the UB-04 forms it submitted to BCBSNC for the Exhibit A Claims contained ICD-9 codes ███████████████ and ██████████████████████████, that these are obesity surgery codes, and, therefore, that the claims must be paid as DRG 288 grouped claims even if they mapped to DRG codes 292 and 293. (ECF No. 73, at p. 12 [SEALED]; ECF No. 109, at pp. 3–4 [SEALED].)

54. On the other hand, BCBSNC contends that the express language of Section 2.4 requires only that ICD-9 codes that are mapped to DRG 288 by its████ software must be paid at the DRG 288 Per Case Rate, and that the NPA does not require BCBSNC to group all claims with a procedure code for ███████████████ ██████████ and a diagnosis code for ██████████████ to DRG 288. (ECF No. 94, at p. 8 [SEALED]; *see also* ECF No. 80, at pp. 12–15 [SEALED].) BCBSNC notes that it is undisputed that both Frye's and BCBSNC's software programs mapped all of the Exhibit A Claims to DRGs 292 and 293. In BCBSNC's view, the evidence clearly shows that it performed under the NPA by mapping the Exhibit A Claims to DRGs 292 or 293 just as Frye did, and reimbursing at the applicable rate for those DRGs instead of DRG 288. (ECF No. 80, at p. 13 [SEALED].)

55. Neither party has provided an explanation, nor presented sufficient evidence, to explain the inconsistencies in its position. Frye acknowledges that its own mapping software mapped the Exhibit A Claims to DRGs 292 or 293, and not to DRG 288, but blames this on an "industry-wide error" in the software. However, Frye

fails to support this claim with competent evidence that an industry-wide "software problem" existed.

56.    Similarly, BCBSNC has provided no explanation for why it paid the ██ claims submitted between January 1, 2013 and March 2014 at the DRG 288 per case rate provided for in Section 2.4, but then suddenly began paying claims at the DRG 292 and 293 rates. BCBSNC states that "[f]rom execution of the NPA in January 2013 until March 2014, 42 of Frye's claims containing the ICD-9 codes for ████████ ████ and the procedure code for ████████████████████████ mapped to DRG 288," but provides no evidence, testimonial or otherwise, to support this claim. In fact, when questioned by the Court as to why it changed from paying the DRG 288 Per Case Rate to paying the lower rate for DRG 292 and 293 procedures in April 2014, BCBSNC conceded it could not provide an explanation for the change.

57.    The Court concludes that the intent behind Section 2.4 is unclear.  There is no dispute that ████████████████████████ , when performed with a diagnosis of ████████████ , is an Obesity Surgery.  Under a plain reading of Section 2.4, the parties may well have intended for BCBSNC to reimburse Frye for all Obesity Surgeries, including those that mapped to DRG 288, at the Per Case Rate. It is an equally reasonable interpretation to read Section 2.4 as requiring BCBSNC to reimburse Frye for the Per Case Rate only when BCBSNC receives a claim that maps to DRG 288.  Either parties' interpretation of Section 2.4 is reasonable under its plain language. *See Carolina Place Joint Venture v. Flamers Charburgers, Inc.,* 145 N.C. App. 696, 699, 551 S.E.2d 569, 571 (2001) (stating that a contract is ambiguous when

"the language of the [contract] is fairly and reasonably susceptible to either of the constructions asserted by the parties"). Therefore, Section 2.4 is ambiguous.

58. Since the Court is unable to determine the intent behind Section 2.4 without consideration of extrinsic evidence, granting summary judgment to either party on the Exhibit A Claims is inappropriate. *See Jefferson-Pilot Life Ins. Co. v. Smith Helms Mulliss & Moore,* 110 N.C. App. 78, 82, 429 S.E.2d 183, 186 (1993). Therefore, the Frye Motion and BCBSNC Motion seeking summary judgment on Frye's breach of contract claim regarding Frye's Exhibit A Claims should be DENIED.

ii. Exhibit B Claims

59. With respect to Frye's claim for breach of contract regarding the Exhibit B Claims, BCBSNC argues that aside from ███ of the Exhibit B Claims, Frye has not put any evidence into the record "to support Frye's contention that the Exhibit B Claims were improperly paid or not paid." (ECF No. 80, at p. 15 [SEALED].) BCBSNC contends that there is no evidence speaking to the "services these claims were for, whether they were, in fact, medically necessary or authorized, or what the alleged breach is for each of these claims." (*Id.* at p. 16 [SEALED].)

60. In its brief in response to the BCBSNC Motion, Frye states that:

> Regarding the 44 Exhibit B claims, Blue Cross NC breached the Agreement by failing to reimburse medically necessary services provided by Frye Regional to Blue Cross's members. Blue Cross NC's breaches are document[ed] by the record evidence, including Frye Regional's bills [(ECF No. 90.8, at Ex. B)], explanation of payments, [(*Id.* at Ex. C)], documented efforts to pursue and to collect the underpayments from Blue Cross NC [(*Id.* at Ex. D)], the damage calculations of the amounts due, [(*Id.* at Ex. A)], and the testimony of [Frye's] corporate

representative [(*See* Marti Depo. ECF No. 90.9)]. For the Exhibit B claims, Frye Regional has incurred ███████ in damages as a result of Blue Cross NC's breaches. [(ECF No. 90.8 at Marti Aff., ¶ 18.)]

(ECF No. 90, at pp. 10–11 [SEALED].) The exhibits filed by Frye contain extensive patient information from Frye's records and other information that raise issues of fact as to the need for the procedures performed and whether they were properly paid under the NPA.

61. "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. Proving that a genuine issue of material fact exists requires a party to present "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and that "means more than a scintilla or a permissible inference." *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (internal citations and quotations omitted).

62. It is this Court's duty to determine "not whether there is literally no evidence, but whether there is any [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

63. The Court concludes that the evidence proffered by Frye to support its Exhibit B Claims is sufficient to allow a reasonable jury to find in favor of Frye on these claims. Therefore, BCBSNC's Motion seeking summary judgment on Frye's Exhibit B Claims should be DENIED.

*D. Reformation*

64. Frye also alleges a claim for Reformation (Count II) with regard to the Exhibit A Claims. (ECF No. 3, at ¶¶ 28–39.) Both parties seek summary judgment in their favor as to the claim for reformation. Courts have the equitable authority to "grant reformation of a contract when the writing does not represent the true agreement between the parties." *Cleland*, 68 N.C. App. at 355, 315 S.E.2d at 81. Whether a contract is properly suited for

> reformation is subject to the same rules of law as applied to all other instruments in writing. It must be alleged and proven that the instrument sought to be corrected failed to express the real agreement or transaction because of mistake common to both parties, or because of mistake of one party and fraud or inequitable conduct of the other.

*Peirson v. American Hardware Mut. Ins. Co.*, 248 N.C. 215, 219, 102 S.E.2d 800, 803–04 (1958) (citation and quotation marks omitted).

65. "To survive summary judgment in an action for equitable reformation of a contract on the basis of inequitable conduct by the promisor, a plaintiff must show a factual basis for four essential elements: (1) the written agreement did not properly express the intent of the parties, (2) the conduct of the promisor caused the improper expression, (3) relevant, competent evidence exists outside the written documents which shows the intention of the parties, and (4) injustice will result if the contract is not rewritten." *Carter v. West Am. Ins. Co.,* 190 N.C. App. 532, 537–38, 661 S.E.2d 264, 269 (2008) (internal citations omitted).

66. Frye contends that if BCBSNC's failure to pay the Per Case Rate for the Exhibit A Claims does not amount to a breach of the NPA, then this Court should

reform Section 2.4 based on a mutual mistake and because Section 2.4 "failed to properly express the parties' Agreement for the payment of Obesity Surgery." (ECF No. 73, at p. 14 [SEALED].) BCBSNC counters by arguing that there is an absence of reliable evidence tending to show that there was a mutual mistake between the parties. (ECF No. 94, at p. 9 [SEALED].)

67. Reformation turns on the Court's ability to ascertain the intent of the parties and put that intent into effect. The Court already has concluded that it cannot determine the parties' intent underlying Section 2.4, and that factual disputes regarding that intent exist that must be decided by a jury. Accordingly, the Court cannot conclude, as a matter of law, that Section 2.4 fails to express the parties' intent, and the Court is unable to determine at the summary judgment stage whether, as a matter of law, reformation of the NPA is proper at this time. Therefore, to the extent the Frye Motion and BCBSNC Motion seek summary judgment as to Frye's request for reformation, the Motions should be DENIED.

THEREFORE, IT IS ORDERED that:

1. The Frye Motion is DENIED.

2. To the extent the BCBSNC Motion seeks summary judgment on Frye's breach of contract claims based on the defense of equitable estoppel, the BCBSNC Motion is DENIED.

3. To the extent the BCBSNC Motion seeks summary judgment based on the statute of limitations defense as to the thirty one (31) Exhibit A

Claims with payment dates before March 23, 2015, the BCBSNC Motion is GRANTED, and is otherwise DENIED.

4. To the extent the BCBSNC Motion seeks summary judgment on ███████████ of Frye's Exhibit B Claims based on the statute of limitations defense, the BCBSNC Motion is DENIED.

5. To the extent the BCBSNC Motion seeks summary judgment based on the evidence that the claim for patient █████████████ was processed and closed before March 23, 2015, the BCBSNC Motion is GRANTED.

6. To the extent the BCBSNC Motion seeks summary judgment based on the Payment Adjustment Provision shortening the statute of limitations, the BCBSNC Motion is DENIED.

7. Except as otherwise granted herein, to the extent the BCBSNC Motion seeks summary judgment on Frye's breach of contract claims regarding Frye's Exhibit A Claims and Exhibit B Claims, the BCBSNC Motion is DENIED.

8. To the extent the BCBSNC Motion seeks summary judgment as to Frye's request for reformation, the BCBSNC Motion is DENIED.

9. BCBNC's Motion to Exclude is DENIED WITHOUT PREJUDICE.

SO ORDERED, this the 17th day of April, 2020.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases